**FIDES PUBLISHERS ASS'N, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 3430.**

United States District Court
N. D. Indiana,
South Bend Division.
Jan. 18, 1967.

John L. Carey and Bruce Bancroft, of Oare, Thornburg, McGill & Deahl, South Bend, Ind., for plaintiff.

Alfred W. Moellering, U. S. Atty., Mitchell Rogovin, Asst. Atty. Gen., and Robert F. Sama and Gene A. Castleberry, Attys., Department of Justice, for defendant.

## MEMORANDUM

GRANT, Chief Judge.

Fides Publishers Association (taxpayer) filed its complaint under 28 U.S.C. § 1346 seeking to recover taxes assessed and paid for the tax year ended December 31, 1958. The Commissioner of Internal Revenue had, on August 30, 1963, retroactively revoked the taxpayer's exempt status previously granted under the predecessor to section 501(c)(3) of the Internal Revenue Code. A deficiency of $2,893.31 was assessed for the 1958 tax year, which the taxpayer paid under protest, and for which he filed a claim for refund with the District Director of Internal Revenue at Indianapolis, Indiana. The claim was disallowed, and this suit followed.

The taxpayer relies on two separate grounds, one dealing with the unlawfulness of the revocation itself, and the other attacking the method of computation of the deficiency. Thus, two issues were presented upon the trial of the case:

(1) Is the taxpayer an exempt organization within the meaning of section 501(c)(3) of the Internal Revenue Code of 1954?

(2) If a tax is due, is taxpayer entitled to write off its inventory and amortize its plate costs for the 1958 tax year?

While these questions will be considered separately, certain background material, presented at the trial, is relevant to both. The Court now makes the following findings:

*Facts*

Fides Publishers Association had its birth in 1940 under the guidance and control of Father Louis J. Putz, C. S. C., its first president. Father Putz, on the faculty at the University of Notre Dame, was deeply involved in the Catholic Action movement, widespread in Europe at the time, but virtually nonexistent in the United States. This movement had as its goal the active participation of Catholic laymen in the affairs of a Church which until that time had been completely dominated by the clergy. Through this publishing organization, Father Putz hoped to educate the Catholic layman as to his new and active role within the Church by putting before him literature which was already circulating widely throughout Europe, England and Canada.

Fides had small beginnings: it was staffed by dedicated Notre Dame students, and operated out of private homes in the South Bend area. The bulk of the publications were translations, though some writing was done by members of Fides' staff. In 1947, faced with the prospect of dissolution, the Association organized itself along more formal lines as an Indiana not-for-profit corporation. The Articles of Incorporation listed the purposes for which Fides was formed:

"Printing, publishing, distributing, wholesale and retail, books and pamphlets and other publications to promote Christian culture and doing all things necessary thereto to the extent that an individual would be able to do, also to promote without profit arts, crafts and trade."

The Commissioner of Internal Revenue in 1948 granted Fides tax-exempt status under the predecessor of section 501(c)(3) of the Internal Revenue Code of 1954

for the reason that it was organized and operated exclusively for religious and educational purposes.

From small beginnings, Fides began to grow. A nine-year summary of Fides' financial status (years 1950 to 1958) reflected this: net sales jumped from $9,097.44 in 1950 to $221,048.79 in 1958; net worth for the same period increased to $55,287.18 from $612.42.[1] In addition,

## FIDES PUBLISHERS ASSOCIATION
### Financial Schedule—1950 through 1958

| | 1950 | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 | 1957 | 1958 |
|---|---|---|---|---|---|---|---|---|---|
| Net Sales | 9097.44 | 31438.96 | 57996.99 | 100152.40 | 90555.56 | 128166.78 | 163088.36 | 146531.03 | 221048.79 |
| Cost of Goods Sold | 4127.97 | 18699.63 | 34089.84 | 45333.37 | 42808.92 | 62078.62 | 82572.35 | 74625.70 | 99418.37 |
| Gross Profit | 4969.47 | 12739.33 | 23907.15 | 54819.03 | 47746.64 | 66088.16 | 80516.01 | 71905.33 | 121630.42 |
| Total Expense | 8706.31 | 11813.93 | 26302.19 | 29936.09 | 40152.15 | 54843.74 | 73555.76 | 88038.83 | 141923.92 |
| Net Profit or Loss | (3736.84) | 925.40 | (2395.04) | 24882.94 | 7594.49 | 11244.42 | 6960.25 | (16133.50) | (20293.50) |
| Gifts | 169.44 | 1113.75 | 2026.00 | 154.50 | 1761.00 | 2600.00 | 185.00 | 4091.60 | 2125.20 |
| Miscellaneous Income | | | 294.46 | 757.42 | 469.35 | 677.33 | 1596.39 | 771.61 | 1835.71 |
| Reserve for Loans | | | | | | 500.00 | | | |
| Fides Family Features | | | | | | | | | 16050.00 |
| Rents | | | | | | | | | 3348.70 |
| Net Worth Ending | 612.42 | 2651.57 | 2576.99 | 28871.85 | 38196.69 | 53218.44 | 61960.08 | 52221.37* | 55287.48 |
| Inventory | 8760.60 | 12288.82 | 19643.99 | 25157.33 | 46064.79 | 58510.18 | 61163.97 | 68773.86 | 114369.31 |

* This figure represents an adjustment to the 1957 Net Worth. Balance 12/31/56=61460.08; Adjustments were 232.87, 916.91, 1.30, and 380.00, or a total of 1531.58. This total of 1531.58, plus the 12/31/56 balance of 61460.08=62991.66. Deducting the net loss for 1957 of 11,270.29 leaves the 12/31/57 balance at 51721.37.

new facilities were added, and by 1958 26 employees were on the payroll, including four full-time employees.[2] Nevertheless, Fides remained true to its main concern, Catholic Action, and according to Father Putz all of its publications carried forth three aims: (1) to provide literature on Catholic Action; (2) to provide literature liable to equip the apostle to achieve a deepening of his life once he is engaged in the work of the Church; (3) to bring out of the apostle a written testimony of his experiences in his apostolic pioneering. Those aims were, in Father Putz's words, "alive and extant in 1958."

In the only year at issue, 1958, Fides printed and published twenty-two books,

2.           FIDES PUBLISHERS ASSOCIATION

SCHEDULE "C" SUPPLEMENT TO FORM 990–A

DECEMBER 31, 1958

COMPENSATION OF OFFICERS: LINE 10.

| NAME | POSITION | SALARY | ROYAL-TIES PAID | TOTAL |
|---|---|---|---|---|
| Eugene S. Geissler | Officer & Director | 6,643.90 | 300.00 | 6,943.90 |
| Vincent J. Giese | Officer & Director | 4,903.72 | 1,280.00 | 6,183.72 |
| Wm. H. McCullough | Officer & Director | 6,599.84 | — | 6,599.84 |
| John T. Evans | Sales Mgr. & Director | 4,741.26 | — | 4,741.26 |
| TOTAL: LINE 10 | | 22,888.72 | 1,580.00 | 24,468.72 |

All of the above mentioned Officers are employed full time at their positions.

all admittedly religious in nature.[3] The actual printing was handled under contract by several independent firms. The books were, by admission, priced to return a profit. On the average, the retail price was set at four times the unit cost,[4] with a 40% mark-down for wholesale buying. It was also admitted, however, that most of Fides' sales were to individuals at retail, and that the 40% mark-up was standard for the book-publishing industry.

In this, as in other years, most of the printed works were translations, though a small handful were written by salaried officers of Fides. There was testimony,

BOOKS PRINTED AND PUBLISHED BY FIDES PUBLISHERS—1958

| Author | Title | Format | Total Print | Subject Matter |
|---|---|---|---|---|
| Trese | More Than Many Sparrows | cloth | 8,000 | Prayer & Spir. |
| Henry | Christ In His Sacraments | cloth | 5,000 | Church & Theo. |
| Henry | Historical & Mystical Christ | cloth | 5,000 | Church & Theo. |
| Geissler | Growing Up Together | cloth | 3,000 | Marriage & Family |
| Dohen | Journey To Bethlehem | cloth | 2,850 | Prayer & Spir. |
| Cuttaz | Our Life of Grace | cloth | 3,000 | Church & Theo. |
| Conway | What They Ask About The Church | cloth | 10,100 | Church & Theo. |
| Connell | The Adolescent Boy | cloth | 8,000 | Marriage & Family |
| Henry | Introduction To Theology | cloth | 3,000 | Church & Theo. |
| Comm. of St. Severin | The Mass—Christians Around Altar | cloth | 3,000 | Church Liturgy |
| Murray | Christian Formation of Adolescent | paper | 3,000 | Liturgy |
| Murray | God & His People CLS II | cloth | 8,000 | Scrip. Catechism |
| Murray | Going To God CLS I | cloth | 26,358 | Church Liturgy |
| Murray | Growth In His Likeness CLS III | cloth | 25,000 | Church & Theology |
| Emmanuel | Teaching Liturgy In School | paper | 4,000 | Liturgy |
| Cerf | Marriage | paper pamphlet | 30,000 | Marriage & Family |
| Cerf | The Rosary | paper pamphlet | 25,000 | Prayer & Spirit'y |
| Carre | Companions For Eternity | paper | 5,000 | Marriage & Family |
| Jungmann | The Eucharistic Prayer | paper | 2,500 | Prayer & Liturgy |

Paperback Reprints in cooperation with Our Sunday Visitor

| Author | Title | Format | Total Print | Subject Matter |
|---|---|---|---|---|
| Rohrbach | Conversation With Christ | paper | 24,000 | Prayer & Meditation |
| | 15,000 of above printing to OSV | | | |
| Geissler | Father of the Family | paper | 20,100 | Marriage & Family |
| | 15,000 of above printing to OSV | | | |
| Meyer | Lend Me Your Hands | paper | 24,274 | Lay Apostolate |
| | 15,000 of above printing to OSV | | | |

3.

4. The unit cost included only the cost of paper, composition, presswork and binding. It did not include Fides' overhead.

largely undisputed, that no large commercial publisher would have handled the bulk of these publications, with the specific exception of Sheed & Ward. That publishing concern, according to Father John L. Reedy, C. S. C., the editor and publisher of Ave Maria Press, might have been influenced to publish some of these works. It was brought out that, even though the subject matter with which Fides dealt received widespread attention in the 1960's, during the 1950's the cause of Catholic Action was an unpopular one.

Fides advertised its publications in several national Catholic magazines with insertions in the spring and fall. There was, additionally, substantial direct mail advertising, and other promotion expenses designed to assist sales.[5]

The four salaried employees on the payroll in 1958 received an average base compensation of $5,750.00. Apparently these were men dedicated to the ideals of Catholic Action, and payment was according to need, resulting in substantial loss of earnings that could be demanded in other positions. However, it was pointed out on cross-examination of Fides' business manager for that year, William McCollough, that the compensation increased with growth from year to year, and that an added advantage to the employee was a vehicle for the publication of his own work, for which there was no other market.[6]

5.

PROMOTION EXPENSE

| | |
|---|---|
| Advertising Expense | 7,550.69 |
| Direct Mail Adv. | 14,634.19 |
| Postage | 2,771.72 |
| Cost of Sample Copies | 4,999.42 |
| Post. on Sample Copies | 411.09 |
| Discounts Earned | (380.87) |
| Cost of Brochures | 1,020.50 |
| TOTAL PROMOTION EXPENSE | 31,006.74 |

———◆———

6.

FIDES PUBLISHERS ASSOCIATION—Compensation of
Officers, Directors and all Full-Time Employees
1956 to 1958

| Year | Name | Position | Salary | Royalties Paid |
|---|---|---|---|---|
| 1956 | V. J. Giese | Director & Editor | $ 3650.00 | $125.00 |
| | E. S. Geissler | " " " | 5340.00 | 70.00 |
| | J. Vilamas | " " Sales Mgr. | 4600.00 | |
| | C. O'Connor | Sec. Treas. & Gen. Mgr. | 3400.00 | |
| | | | $16990.00 | $195.00 |
| 1957 | V. J. Giese | Director & Editor | 4231.02 | 234.45 |
| | E. S. Geissler | " " " | 6540.04 | 50.60 |
| | J. Vilamas | " " Sales Mgr. | 1280.00 | |
| | C. O'Connor | Sec. Treas & Gen. Mgr. | 3599.96 | |
| | J. Evans | Director & Pom. Mgr. | 6025.00 | |
| | | | $21686.02 | $285.05 |
| 1958 | E. S. Geissler | Director & Editor | 6643.90 | 300.00 |
| | V. J. Giese | Sec'y-Director & Editor | 4903.72 | 1280.00 |
| | W. H. McCullough | Director & Gen. Mgr. | 6599.84 | |
| | J. T. Evans | Director & Sales Mgr. | 5038.48 | |
| | | | $22888.72 | $1580.00 |

It was brought out that, although these employees did publish their own works they surrendered their royalty payments due to the critical state of the business. There was no evidence to substantiate this, however, and to the contrary, some $1500 in royalties were paid in the year 1958.

It clearly appeared that Fides, in the year 1958 and all other years, was engaged primarily, if not solely, in publishing activities. There was some evidence that substantial donations of books were made to charity, but in no event did it exceed $2000 in any one year. When compared with the inventory on hand in 1958—$114,369.41—and the net sales of that year—$221,048.79—however, this is minimal. Obviously, it was admitted by Father Putz that Fides was not formed for the purpose of giving away books. It is also clear, however, that Fides' primary aim was to educate the Catholic lay apostolate.

It was further substantiated that Fides was an independent publishing operation, having no official connection with either the University of Notre Dame or the local Catholic diocese.

There was some question about the accuracy of the accounting practices employed by Fides, but for purposes of summarizing the dollar value of business conducted in 1958, a Profit & Loss Statement is included below.[7] While the net

7.

### FIDES PUBLISHERS ASSOCIATION
### PROFIT & LOSS STATEMENT
### DECEMBER 31, 1958

| | | |
|---|---:|---:|
| GROSS SALES | | |
| General | | 283,170.62 |
| Book Club | | 5,451.00 |
| O.S.V. | | 15,924.02 |
| | | 304,545.64 |
| LESS | | |
| Trade Discounts | 78,954.07 | |
| Cash Discounts | 1.24 | |
| Returns & Allowances | 4,541.54 | 83,496.85 |
| NET SALES | | 221,048.79 |
| COST OF GOODS SOLD | | |
| PRODUCTION COSTS | 101,792.47 | |
| Inventory 12/31/57 | | |
| Book Production Costs | 94,995.91 | |
| Translation Costs | 1,100.00 | |
| Purchase of Other Books | 391.08 | |
| Freight In | 2,701.71 | |
| Book Club Prod. Costs | 2,783.11 | |
| O.S.V. Prod. Costs | 11,336.48 | |
| Prod. Costs Sample Copies | (1,139.83) | |
| Discounts Earned | (173.25) | |
| | 213,787.68 | |
| Less: Inventory 12/31/58 | 114,369.31 | 99,418.37 |
| COST OF GOODS SOLD | | |
| GROSS PROFIT | | 121,630.42 |
| DIRECT COSTS | | |
| Holding Type Charge | 879.20 | |
| Copyright Expense | 80.00 | |
| Royalties Earned by Auth. | 19,706.15 | |
| Payments in Lieu of Royal. | 2,644.20 | |
| Advances Charged Off | 778.75 | |
| TOTAL DIRECT COSTS | | 24,088.30 |
| NET PROFIT AFTER DIRECT COSTS | | 97,542.12 |

profit for that year is reflected at a very low figure (some $1500.00), the accumulation of income was in excess of $55,000.00.[8] Fides reported comparable figures on its Form 990–A ("Return of Organization Exempt from Income Tax") filed with the Internal Revenue Service. That 1958 Return showed accumulated income to be $3,066.11, with a total accumulation of $54,787.48.

One item included in that $3,066.11 figure was $2,125.20 in gifts donated to Fides. While there was some testimony as to Fides' strong reliance on such contributions, set against the backdrop of the entire operation, its importance was minor. There is no justification for arguing that Fides was sustained by such gifts, as evidenced by the nine-year history of contributions.[9]

On August 30, 1963 the Commissioner of Internal Revenue retroactively revoked Fides' tax-exempt status to taxable years ending after December 31, 1957. Shortly thereafter a deficiency notice was mailed covering the 1958 tax year which, after making certain adjustments in reported taxable income, assessed a deficiency in the amount of $2,893.31.

### Exemption Under Section 501(c) (3)

The Internal Revenue Code extends exemptions from income tax to, among others, the following organizations:

"Corporations * * * organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes * * * no part of the net earnings of which inures to the benefit of any pri-

OPERATING EXPENSE

SCHEDULE A

| | | |
|---|---|---|
| Editorial Expense | 16,352.63 | |
| Selling Expense | 22,095.22 | |
| Promotion Expense | 31,006.74 | |
| Shipping & Whse. Exp. | 10,281.95 | |
| General & Adm. Expense | 28,795.18 | |
| TOTAL OPERATING EXPENSE | | 108,531.72 |
| NET PROFIT OR LOSS | | *(10,989.60) |

OTHER INCOME & EXPENSE:

(SCHEDULE B)

| | | |
|---|---|---|
| Misc. Publishing Income | 1,678.86 | |
| F.F.F. & N.D. Office | 10,350.09 | |
| Other Misc. Income | 430.05 | 12,459.00 |
| TOTAL OTHER INCOME | | |
| NET PROFIT 12/31/58 | | 1,469.40 |

* Indicates Loss

8. That figure appears on the statement found in footnote 1, supra.

9. The contributions over a nine-year period were as follows:

| YEAR | AMOUNT |
|---|---|
| 1950 | $169.44 |
| 1951 | 1113.75 |
| 1952 | 2026.00 |
| 1953 | 154.50 |
| 1954 | 1761.00 |
| 1955 | 2600.00 |
| 1956 | 185.00 |
| 1957 | 771.61 |
| 1958 | 1835.71 |

vate shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office." § 501(c)(3), I.R.C. of 1954.

There has been no attempt to show that any individual profits by the taxpayer's operation, nor that it engages in propaganda activities. We are therefore concerned only with the requirement that the taxpayer be "organized and operated exclusively for" an exempt purpose.

The claim that the taxpayer does not meet the organizational test has since been abandoned by the Government, since according to Treasury Reg. § 1.501(c)(3)-1(b)(6), the taxpayer is relieved of the burden of this requirement.[10] This leaves only one issue, namely, was the taxpayer "operated exclusively for" an exempt purpose.

The taxpayer has taken the position that the so-called operational test is met by a consideration of, not the organization's activity, but rather the end for which that activity is undertaken. Reference is had to The Golden Rule Church Association, 41 T.C. 719 (1964), wherein that view is proposed. Since it was adequately demonstrated at the trial that the "end" towards which the publishing operation was directed was the education of the Catholic laity, then the conclusion is pressed that taxpayer must be exempt. For further support the taxpayer relies on Treasury Reg. § 1.501(c)(3)-1(e):

"An organization may meet the requirements of section 501(c)(3) although it operates a trade or business as a substantial part of its activities, if the operation of such trade or business is in furtherance of the organization's exempt purposes * * *."

A number of other cases are said to support the taxpayer's position, including A. A. Allen Revivals, Inc., T.C. Memo. 1963-281 (1959) and St. Germain Foundation, 26 T.C. 648 (1956).

We do not feel compelled to accept that conclusion. All of the above cases dealt with organizations whose commercial activities were but a part of the overall plan of action to promote religious goals. In the *A. A. Allen Revivals* case the taxpayer-corporation espoused a particular religious doctrine through the operation of schools, church services and religious programs on radio and television, as well as by the publication and sale of religious books, pamphlets and magazines. The publishing activities were held not to deprive the corporation of its tax-exempt status. The Golden Rule Church Association was formed to propagate a religion, and in order to finance their program operated for profit a ranch and a chain of laundries, sold baskets, and published booklets. Again the commercial activities were found not to affect the exemption. In the *St. Germain Foundation* case the sale of religious literature was held to be incidental to the religious purposes of a corporation which advocated the "I Am" religion by means of lectures, tours, broadcasts and the operation of reading rooms.

We fully agree with the principles enunciated in these cases and the Treasury Regulations, but only as they are applied to the organizations therein described. They deal with an organization only a part of whose activities, although it may be a *substantial* part, is commer-

---

10. The taxpayer was determined to be exempt in 1948. Treasury Reg. § 1.501(c)(3)-1(b)(6) provides:
"If before July 27, 1959 an organization has been determined by the Commissioner or District Director to be exempt as an organization described in Section 501(c)(3) or in a corresponding provision of prior law and such de-

termination has not been revoked before that date, the fact that such organization does not meet the organizational test prescribed by this paragraph shall not be a basis for revoking such determination."
Clearly this Regulation covers the taxpayer.

cial in nature. It is assumed that the corporation is operated only for exempt purposes. This is never questioned. The inquiry is whether certain commercial activities, admittedly necessary for the perpetuation of any large organization,[11] are carried on in furtherance of those purposes. Fides, however, is not such an organization, and cannot be governed by the same standards. Fides, as distinct from the St. Germain Foundation or the Golden Rule Church Association, is an organization whose *sole* activity is the carrying on of a trade or business. This, we conclude, directly brings into question the taxpayer's assertion that it operates only for exempt purposes.

■ That the so-called operational test gives rise to two distinct inquiries is disconcerting, but there is an historical basis for it. The first inquiry, what might be called the "activities" standard, had its origins in the famous case of Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924). In that case the taxpayer-corporation, the legal representative of an ancient religious order, was concededly organized and operated for religious purposes, but the government contended that certain commercial activities engaged in for profit destroyed the exemption. The corporation had extensive investments in real estate and stock holdings which returned a profit, as well as some incidental sales of wine, chocolate and other articles. The Court nevertheless held the corporation exempt, explicitly recognizing that "[s]uch [religious] activities cannot be carried on without money." 263 U.S. at 581, 44 S.Ct. at 205. In the course of its opinion the Court came to two conclusions: (1) the predecessor to section 501(c) (3) allowed a charitable corporation to engage in business activities for profit if the income was destined for charitable uses; (2) when the activities are a "negligible factor" (as was the sale of wine and chocolate), they are

incidental to the religious purposes and have no effect on the exemption. Neither of these activities, the Court said, altered or enlarged the purposes for which the corporation was created and conducted.

This case led to the formulation of the Destination-of-Income Test which was used to draw a clearcut line between an organization's ultimate purposes and its activities: if the profits from the commercial activities are devoted to charitable uses, then an exemption is granted. Illustrative of its application is Roche's Beach, Inc. v. Commissioner of Internal Revenue, 96 F.2d 776 (2nd Cir. 1938), wherein a charitable corporation was permitted to operate a public beach for profit, since the income was devoted to charitable purposes. However, due to a growing concern over the tax advantages derived from the operation of a commercial business within an exempt organization, the Congress in 1950 passed legislation which taxed the unrelated business income of certain exempt organizations. See Section 511 of the Internal Revenue Code of 1954. This legislation did not extinguish all discussion of the "activities" standard, see, e. g., Lichter Foundation v. Welch, 247 F.2d 431 (6th Cir. 1957); it remains alive whenever, as the taxpayer's authorities demonstrate, part of the activities, though commercial, further the exempt purposes.

The second inquiry, which concerns us here, derives from another Supreme Court opinion which interprets identical language ("organized and operated exclusively for * * * charitable purposes") in the Social Security Act. In that case the Better Business Bureau of Washington, D. C., Inc. sought to exempt itself from social security taxes on the ground that it was operated exclusively for educational purposes. The Court, in proposing a workable test, said:

> "In this instance, in order to fall within the claimed exemption, an or-

---

11. There are basically two reasons why an exempt organization is forced into business: (1) the need of funds to carry on charitable purposes; (2) the need of a vehicle through which the views of the organization can be presented to the public.

ganization must be devoted to educational purposes exclusively. This plainly means that the presence of a single non-educational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes." Better Business Bureau of Washington, D. C. v. United States, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L. Ed. 67 (1945).

The Court found such a noneducational purpose in the promotion of a profitable business community, referring to the Bureau's "commercial hue", and stating that "Petitioner's activities are largely animated by this commercial purpose." 326 U.S. at 284, 66 S.Ct. at 114.

The search for a single non-exempt purpose, substantial in nature, which would destroy the exemption, has been conducted under section 501(c) (3). A. A. Allen Revivals, Inc., T.C.Memo. 1963–281 (1959); Universal Oil Products Co. v. Campbell, 181 F.2d 451 (7th Cir. 1950). In the *Universal Oil Products Co.* case the court, while accepting the *Better Business Bureau* test, distinguished the *Trinidad* case (and thus the "activities" standard) on the ground that "The primary purpose of the organization and operation of the taxpayer was not in question." 181 F.2d at 458. We have concluded in this case that the purposes for which the taxpayer operates are directly in question.

█ █ The facts of this case clearly demonstrate the need for distinguishing between the purposes and the activities of an organization. Taxpayer here clearly meets the requirements of the test proposed first in *Trinidad:* the publishing activities further the exempt purpose of educating the lay apostolate. Certainly there is no better way to capture the attention of a widely dispersed public. The publication of literature is, concededly, the "common method in carrying out the religious and educational purposes of any exempt organization." A. A. Allen

Revivals, Inc., T.C.Memo. 1963–281 (1959). It cannot be logically argued otherwise.

The exemption can only be denied, then, if the taxpayer is being operated for some non-exempt purpose which is substantial in nature. Such a purpose does exist. It may be described as the publication and sale of religious literature at a profit. In effect, the sole activity of Fides defines at least one purpose for which it is operated. It could not be otherwise. If it were, every publishing house would be entitled to an exemption on the ground that it furthers the education of the public.

█ Rarely has the specific question raised here been considered by the courts. The leading authority denied tax-exempt status to a religious publishing house which lacked denominational ties. Scripture Press Foundation v. United States, 285 F.2d 800, 152 Ct.Cl. 463 (1961), cert. den. 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962). There a man and his wife, deeply interested in religion, formed a corporation devoted to the publication and sale of religious literature, and designed to upgrade the quality of existing teaching materials for Bible instruction in Sunday schools. The publications enjoyed increasing sales and returned rising profits. To the argument that their motives were pure, the court rather callously, but undoubtedly correctly, said: "Piety is no defense to the assessments of the tax collector." 285 F.2d at 804. The court further concluded that, under the *Better Business Bureau* test,

"We think the sales activities of plaintiff reflect a 'non-educational purpose' and are not only 'substantial in nature' but preponderate." 285 F.2d at 806.

The Court of Claims reaffirmed its position in the *Scripture Press* case in American Institute for Economic Research v. United States, 302 F.2d 934, 157 Ct.Cl. 548 (1962). In denying tax-exempt status to an organization which researched

economic problems and published its findings for a profit, the court said:

"By the sale of these publications and services, plaintiff has entered, unwittingly or not, a business. We conclude that this business purpose is primary and not incidental to any educational purpose which may be present. It is not the fact of profits alone which compels this conclusion, for plaintiff is also hampered, as we have discussed above, by the methods it has selected to disseminate this type of subject matter." 302 F.2d at 938.

See also Evanston-North Shore Board of Realtors v. United States, 320 F.2d 375, 162 Ct.Cl. 682 (1963). These authorities are controlling and, to the Court, indistinguishable from the facts of the instant case.

■■■ To deny that Fides, an independent, profit-making publisher of specialized literature, is operated for a business purpose, is to avoid reality. Having no other function, that purpose must be ascribed to it notwithstanding sincere disclaimers of any such intent. As the Court of Claims recognizes, one may enter a business unwittingly. Having done so, the attendant responsibilities must be borne. In short, the tax must be paid.

*Valuation of the Tax Due*

An initial question of the propriety of recomputing the deficiency was raised at the trial by the Government. Its position was that, since the claim for refund filed by the taxpayer did not dispute the Government's evaluation of the deficiency, the taxpayer could not argue it at the trial. The Government seems to have abandoned this contention in its brief, and, in light of the circumstances and the authorities in the taxpayer's brief, notably Tucker v. Alexander, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927), this was properly so. In the interests of justice for all concerned, we do now consider this problem. There are two distinct issues:

■■ *(1) Inventory Write-Off.* In both its financial statement and Form 990–A submitted to the Internal Revenue Service, the taxpayer valuated its opening and closing inventories for the 1958 tax year without allowing for the future unsalability of some of the volumes in stock. It is conceded that the write-off of such unsalable inventory is proper to accurately reflect net income. It is allowed by Section 471 of the Internal Revenue Code of 1954, and further it is a customary practice for the book publishing industry. It is also clear that the taxpayer may be entitled to reassess his deficiency by making proper adjustments to inventory in prior years. See, e. g., C-O-Two Fire Equipment Co. v. Commissioner of Internal Revenue, 219 F.2d 57 (3rd Cir. 1955). The Government's principle objection, then, is that the method employed to recompute inventory was improper.

■ The inventory write-off was accomplished in the following manner: from the actual inventory on hand was deducted that quantity of books which the taxpayer anticipated would be sold over the next two-year period. The remaining inventory was written off as obsolete. The Government makes two arguments. First, it attacks the use of a two-year sales period for books of a religious nature which, it is claimed, have a longer useful life than ordinary commercial publications. However, the Government presented no evidence on the issue and, to the contrary, the taxpayer's qualified accountant testified that a two-year evaluation of future sales was "fair for the type of titles you have here." This argument, then, has no merit, especially in light of the Government's own Treasury Regulation § 1.471–2 which provides that inventory rules must "give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business."

Second, the Government contends that the anticipated sales were not anticipated at all, but rather were the actual sales occurring over the two-year period, derived from a hindsight evaluation in 1961. This is certainly true, and it was admitted by the taxpayer. But we cannot conceive of any reasonable alternative, given the fact that in 1958 the taxpayer did not have the benefit of accounting advice which would have led to an estimate of future sales. This is certainly no invitation, and we do not thus interpret taxpayer's argument, to allow the taxpayer the privilege of reopening earlier tax years on the basis that the sales then anticipated were not actually achieved during the two-year period. The adjustment to inventory is allowed only because, in the year 1958, taxpayer neither employed an accountant to write off inventory, nor expected that a tax would be assessed in part on the erroneous evaluation of that year. We conclude, therefore, that the taxpayer is entitled to make the adjustment presented at the trial.

The inventory write-offs were as follows:

| | | |
|---|---|---|
| Decrease in 12/31/58 inventory | | $18,479.73 |
| Decrease in 12/31/57 inventory | (less) | 17,065.49 |
| TOTAL (additional expense) | | 1,414.24 |

The figure is an added deduction which reduces the taxpayer's net income for the 1958 tax year.

*(2) Amortization of Plate Costs.* This issue is shot through with confusion. We can only tentatively suggest the outlines of the problem for, from all that appears, the parties themselves did not fully comprehend it.

The taxpayer in its original financial statement and 1958 return apparently included as an item of expense (and therefore deduction) the "prepaid plate (or plant) costs" attributable to that year. These costs were defined by Mr. Daniel Klein, the taxpayer's accountant, to include "composition and type-setting and similar costs that are incurred in making or preparing the plates for the press run." The Government, however, disallowed this deduction since in its opinion these costs represented a capital expenditure which must be amortized over a period of years. This adjustment resulted in an increase in income of some $10,000.

Closer analysis reveals the contradictions present, however. The plate (or plant) costs of two sets of books were in controversy:

*(a) Theology Series (two titles)*—According to the testimony of Mr. Klein, and apparently admitted by the Government, the taxpayer had included the plate costs for these titles in the unit cost per copy of the inventory evaluation. This expense was therefore accurately charged off (i. e., amortized) in the appropriate tax period in which the copies were sold.

However, the Government, apparently mistaken on the point, considered these costs to be an expense which they capitalized and then directed to be amortized. In effect, the taxpayer was enjoying the benefit of a double deduction (as part of inventory, and as a capital expenditure) which reduced his taxable income. If it is true that the deduction was taken twice (as we so find) then in computing the taxpayer's net income no allowance should be made for this series other than that already included in inventory.

*(b) Christian Life Series (three titles)*—These figures are even more complicated. According to Mr. Klein, the taxpayer deducted part of these costs as an immediate expense

and amortized the rest.[12] The Government did not do much better. It capitalized the entire amount, amortized at the rate of 15¢ per copy those actually sold in the tax year, and further amortized the balance over a five-year period. In Mr. Klein's opinion, the proper accounting procedure would capitalize the entire amount and amortize that same amount over a five-year period.

This last approach obviously comes close to acceptable accounting practices. According to the testimony of another accountant familiar with the book publishing industry, there are three accepted techniques: (1) write off the entire expense at publication date; (2) amortize the costs over the first printing; (3) amortize over the period of estimated useful life of the book (e. g., five years).

We are persuaded to accept the last technique as the one to be applied to this case. Unfortunately, the Government chose not to enlighten the Court as to the correctness of its computation, one which was characterized by the taxpayer's experts as being "drawn out of the air." From all that we have before us, including their admitted error on the computation of the amortization of the Theology Series, we cannot presume that it is correct. Therefore, we conclude that the tax which is due must be computed under a procedure which would amortize the plate costs of the Christian Life Series over the five-year period.

In accordance with our findings on the second issue, namely, the computation of tax due, the plaintiff will submit to the Court proposed findings, indicating the computations made and the tax due thereunder.

12. This was explained by Mr. Klein as follows:

"A. This account for the year 1958 contained a balance of some thirteen odd thousand dollars which was the opening balance and constituted the plate costs for three titles in the Christian Life Series.

These three plates were flat plates and were written off entirely during the year.

Also during the year 1958, the same three titles, I should say the cost of plates for the same three titles in cylindrical form were added to the account.

Then the determination by Fides of their amortization was deducted from the account for each of these three titles."

It is obvious that an evaluation of such testimony could easily lead to misinterpretation and therefore, while we make an attempt to search out the areas of disagreement, we hesitate to be definitive about the facts.