**ELISIAN GUILD, INC., Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

**No. 7276.**

United States Court of Appeals
First Circuit.

June 20, 1969.

John L. Saltonstall, Jr., Boston, Mass., with whom R. Lisle Baker and Hill & Barlow, Boston, Mass., were on brief, for appellant.

Carolyn R. Just, Atty., Dept. of Justice, with whom Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson and Meyer Rothwacks, Attys., Dept. of Justice, Paul F. Markham, U. S. Atty., and Joseph A. Lena, Asst. U. S. Atty., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

The issue presented in this case is whether the plaintiff corporation, Elisian Guild, Inc., is exempt from federal income taxes under 26 U.S.C. § 501(c) (3) by reason of its religious or educational activities. The facts pertinent to the controversy, largely stipulated, are as follows.

Elise Nevins Morgan, the author of various short works of a religious nature,[1] died in 1954. Her husband, William Finlay Morgan, continued to distribute the books upon request from the dwindling supply that remained. Thereafter, in 1960 it came to Morgan's attention that excerpts from his late wife's works had appeared in an anthology published by Harpers. Stimulated by this showing of interest on the part of others, Morgan determined to form an organization to disseminate the books once again on an ongoing basis. To accomplish this, the Elisian Guild, Inc. was incorporated on February 14, 1961, pursuant to Mass. Gen. Laws ch. 180. The corporation had no capital stock. As originally drawn, the Articles of Organization provided that the purpose of the corporation was

"to collect and edit, and to publish, disseminate and distribute to the public for educational and religious purposes essays, articles, books, pamphlets and works of art, and dramatic works, dealing with, commenting upon or expounding some aspect of the Christian religion, Christian teaching, and the lives of great Christians and the Christian way of life, or religious, religious teachers, religious leaders or ways of life in the Christian tradition, or consistent with Christianity and its doctrines, the works to be so disseminated to include but not to be limited to those of the late Elise Nevins Morgan."

On February 20, 1964, the Articles were amended to include the following language:

"This Corporation is organized exclusively for educational and religious purposes, and only in furtherance of these purposes will the Corporation carry out the activities set forth in its Articles of Organization.

"In the event the Corporation is dissolved or annulled, all property of the Corporation, or the proceeds thereof, shall not go to or enure to the benefit of the members of the Corporation nor be divided among them, but, after payment of all just debts and expenses of the Corporation, shall be distributed and paid over to such institution or institutions in the Commonwealth as the Trustees shall designate, provided such institution or institutions shall be organized for charity and not for profit."

---

1. These books reflected a Christian but nonsectarian point of view.

■ The Guild has been solely in activities connected with the publication of the Morgan books. It has not been engaged in other activities such as conducting lectures, schools or reading rooms. Although, as stated above, the overall tax status of the Guild is in actual issue here, the technical basis of the action is much narrower. For most of the years of its existence the Guild has operated in the red. Thus any tax worries have been academic. In 1962, however, its operations showed a profit. Even this was not the result of its day-to-day operations but rather from the sale of a capital asset (stock) given to it by Morgan. The taxes (including penalties and interest) on the resulting gain were $2,457.58. The Guild paid this assessment but sought, unsuccessfully, to recover it in the district court. See Elisian Guild, Inc. v. United States, 292 F.Supp. 219 (D.Mass.1968). To come within the statute a taxpayer must be both organized and operated exclusively for exempt purposes. See Treasury Reg. § 1.501(c) (3)–1(a) (1). The district court held that this taxpayer was neither.[2]

### The organizational test.

■ A number of points are raised in regard to the organization of the Guild. The government emphasizes that the original Articles did not limit the Guild "exclusively" to its exempt purposes. But no authority is cited for the proposition that the word "exclusively" or its equivalent must explicitly appear. It is no doubt true, as the government contends, that the taxpayer would not be exempt merely because its Articles of

Organization did not expressly authorize it to carry on activities for non-exempt purposes. But here there is more than merely the lack of express authorization. A fair reading of the Articles yields a strong inference that the description of purposes is exclusive. This is especially so in view of the fact that a corporation is empowered to act not in general but only in accordance with the limited powers given to it by its Articles of Incorporation. See Wiley & Foss, Inc. v. Saxony Theatres, Inc., 335 Mass. 257, 260, 139 N.E.2d 400, 402 (1957); Pilgrim Real Estate, Inc. v. Superintendent of Police, 330 Mass. 250, 112 N.E.2d 796 (1953).

But the regulations provide that an organization is not for an exempt purpose unless the corporate assets will continue to be so dedicated even after dissolution.

"An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes, * * * However, an organization does not meet the organizational test if its articles or the law of the State in which it was created provide that its assets would, upon dissolution, be distributed to its members or shareholders." Regs. § 1.501(c) (3)–1(b) (4).

■■ The government stresses that the Articles of Organization did not as of 1962 specifically provide that the taxpayer's property should on dissolution be used only for exempt purposes.

---

**2.** While we will find it convenient, as did the district court and the parties, to treat this question as involving two separate tests, i. e., "organized" and "operated", the phrase "organized and operated" must also be read as a unity. See 6 J. Mertens, The Law of Federal Income Taxation § 34.07 at 24 (1968): "The issue of 'organized' as used in the Code is primarily a question of fact not to be determined by an examination of the certificate of incorporation but by the actual objects motivating the organiza-

tion and the subsequent conduct of the organization. To some degree therefore, the word 'organized' cannot be divorced from 'operated' for the true character of an organization must be drawn in the final analysis from the manner in which it has been operated. The basic problem is to determine the primary or dominant purpose for which the organization was created, and to ascertain whether such purpose is carried out in the operations conducted by the organization."

Once again, however, no authority is cited that supports the notion that the Articles must specifically so provide. Further, the original Articles require "that no property of the Corporation, real, personal or mixed, shall be used for or enure to the benefit of any member of the Corporation at any time whatsoever, but shall be used only for the purposes hereinabove set forth." This, no doubt, contemplates principally the conduct rather than the dissolution of the corporation but takes on an additional flavor when read in light of a section of Article XXII of the original by-laws. This is reproduced above as the second paragraph of the February 20, 1964, amendments to the Articles,[3] and makes it plain that even upon dissolution the corporate property would be distributed in a way consistent with the exempt purposes rather than for the benefit of the members of the corporation. Thus, in this case the by-laws, in effect a contract between the corporation and its members, see Massachusetts Charitable Mechanic Association v. Beede, 320 Mass. 601, 608, 70 N.E.2d 825, 829 (1947), clarify any ambiguity that might otherwise exist in the Articles. *Cf.* Commissioner of Internal Revenue v. John Danz Charitable Trust, 284 F.2d 726, 733 (9th Cir. 1960); Passaic United Hebrew Burial Association v. United States, 216 F.Supp 500 (D.N.J.1963).[4]

### The operational test.

First let it be said that what we seek to determine here is whether the Guild's exempt purpose transcends the profit motive rather than the other way around.[5] See Fides Publishers Association v. United States, 263 F.Supp. 924 (N.D.Ind.1967), where the court said:

"The facts of this case clearly demonstrate the need for distinguishing between the purposes and the activities of an organization. * * * To deny that Fides, an independent, profit-making publisher of specialized literature, is operated for a business purpose, is to avoid reality." *Id.* at 935–936.

In *Fides* net sales jumped from $9,000 in 1950 to $221,000 in 1958; net worth increased from $600 to $55,000, *id.*, at 927; the books were priced to return a substantial profit, *id.* at 929. Also, in Scripture Press Foundation v. United States, 285 F.2d 800, 152 Ct.Cl. 463 (1961), cert. denied, 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962), the court said:

"If the defendant seeks * * * to suggest that where an organization's profits are very large a conclusion that the organization is noncharitable must

---

3. On February 3, 1964, the Internal Revenue Service responded to an application for tax exemption for the Guild by requesting additional information and suggesting two changes in the Articles of Organization. The Guild made these changes on February 20, 1964. In the first paragraph the Guild adopted the suggested wording of the Service; in the second it made what had been part of Article XXII of the by-laws part of the Articles of Organization.

   In view of this background we think it clear that no inference may be drawn that by acquiescing in these suggestions the Guild acknowledged that its original Articles were in any way deficient. Nor may it be assumed that because a stronger case for exemption was provided in 1964 that the case in 1962 was insufficient.

4. Taxpayer also contends that quite apart from what the Articles may say, the alternative recognized by the Regulations is verified, viz., that by operation of law the assets of the Corporation would be distributed for exempt purposes. It is true that ch. 180 § 11A (Voluntary Dissolution) and § 11B (Dissolution Upon Petition of Attorney General) provide that the resources of the Corporation continue to be dedicated to "such similar public charitable purposes as the court may determine." But this was an amendment to ch. 180 that was approved on May 21, 1962, to be effective ninety days thereafter. The proceeds from the sale of the stock, on the other hand, were deposited to the account of the Guild on February 1, 1962.

5. In this context we are considering whether an organization is disqualified from exemption because it is in fact a business. This is different from whether an organization, admittedly run as a business, is exempt because it contributes its profits to an exempt organization. Such "feeder" organizations generally do not qualify for exemption because of 26 U.S.C. § 502.

follow, we reject such a suggestion. If, however, defendant means only to suggest that it is at least some evidence indicative of a commercial character we are inclined to agree. * * * We think the enormity of the contrast between what plaintiff has accumulated from sales each year and what it has expended for its educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase is incidental thereto." *Id.* at 803, 804–805. There, expenditures for religious educational programs during the years in question rose from $21,000 to $72,000 annually, whereas accumulated capital and surplus during the same years rose from $476,000 to $1,610,000. *Id.* at 804. Accord, Parker v. Commissioner of Internal Revenue, 365 F.2d 792, 798 (8th Cir. 1966), cert. denied, 385 U.S. 1026, 87 S.Ct. 752, 17 L.Ed.2d 674 (1967).

██ How does the Guild fare under such a test? It has not either in 1962, the year principally in question, or otherwise, had operational profits. While the government rightly contends that failure to show a profit does not per se entitle a corporation to exempt status, we think that in this case the deficit operation reflects not poor business planning nor ill fortune but rather the fact that profits were not the goal of the operation.[6] The copyrights of the Morgan works were donated to the Guild and no royalties were paid. The government relies on testimony of the Guild's treasurer, Sheridan Thorup, to the effect that a profit was desired but it is clear that he meant merely that working capital was desired so that the Guild could continue to oper-

ate.[7] Further, the government's reliance on the discrepancy between average unit costs of books and average distribution price is misleading. The "cost" was only the actual cost of printing and did not include other expenses such as editorial,[8] secretarial and legal fees.

Furthermore, the very smallness of the Guild's operations shows how inapplicable is the reasoning in *Fides* and *Scripture Press, supra*. In 1962 the Guild sold 313 books for $615.70. Also five books were given away. This was in no way unusual, the sale of about 400 books a year being typical. We do not suggest that the small scale of an operation is an infallible index of exempt purpose any more than we asserted as much for failure to show a profit. We merely note that when it is claimed that an exempt purpose is swallowed up in the fact of a thriving business operation, it is pertinent to inquire how big a swallow a $600 a year operation can be expected to take.

There are, it must be admitted, some disconcerting features to the Guild's finances. Although it did not accumulate profits, it did build up an inventory which was extraordinary in view of its past sales history. In 1962 there was an inventory of approximately $3,100; by 1967 this had increased by about $10,-000.[9] It is hard to understand why such an inventory was thought to be desirable for an operation that was not large and indeed was not even growing. Still, we think an over-optimistic inventory is far less suspect than burgeoning profits.

A second factor that causes us to look more closely at the Guild's finances is the government's contention that Morgan profited personally in regard to his own

---

6. "We do not mean to say that a profitable operation must lead to taxation while a nonprofitable one will be exempt. However, we regard consistent nonprofitability as evidence of the absence of commercial purposes." Golden Rule Church Association v. Commissioner of Internal Revenue, 41 T.C. 719, 731 (1964).

7. Thorup further testified that if anyone neglected to pay a bill that the Guild "might send them a second bill" but would pursue the matter no further.

8. The books as now published are not exactly in accordance with Mrs. Morgan's original books but are new and enlarged editions.

9. The government, relating this surfeit of inventory to the question whether profit was desired, suggested that profit would have resulted had the Guild been able to dispose of its inventory. Thorup acknowledged that this might be true in theory but stated that there was little prospect of a suitable buyer.

taxes from his gifts to the Guild. The Guild was able to sell the stock for $7,446.10, although it had cost Morgan only $478.20.[10] He deducted $7,446.10 from his income taxes as a result of the gift. While it is true that this arrangement was more beneficial from the donor's point of view than giving cash to the Guild and then selling the stock for his private benefit, it was hardly a "saving" in any ordinary sense. He was able to "save" taxes only because as a result of the gift the Guild rather than he received the $7,000 profit on which the taxes would have been based. In any event, the decision to make the gift in this way does not affect the Guild's tax status. See Waller v. Commissioner of Internal Revenue, 39 T.C. 665, 676–677 (1963).

In our opinion the district court was clearly erroneous in holding that the plaintiff corporation was not exempt under 26 U.S.C. § 501(c) (3).

Reversed.

10. Morgan made other contributions on a similar basis in later years.