## CHANGE–ALL SOULS HOUSING CORPORATION

v.

### The UNITED STATES.

No. 56–79.

United States Court of Claims.

Feb. 10, 1982.

---

**12.** But see note 5, *supra*.

**13.** But see note 7, *supra*.

John P. Manwell, Washington, D. C., attorney of record, for plaintiff; Kirkland & Ellis, Washington, D. C., of counsel.

Kevin B. Shea, with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and NICHOLS, Judge.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

FRIEDMAN, Chief Judge, delivered the opinion of the court:

The issue in this case is whether the plaintiff is a private foundation under section 509(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 509(a) (1976). The plaintiff seeks a declaratory judgment under 26 U.S.C. § 7428 that it is not such a foundation. We agree.

### I.

Before discussing the facts of this case, it is helpful to describe briefly the provisions of the Internal Revenue Code governing the determination whether a tax-exempt organization (which the plaintiff is) is or is not a private foundation.

The effect upon a tax-exempt organization of being a private foundation, as defined by section 509(a) of the Code, is that it is subject to, *inter alia*, a 4-percent excise tax on net investment income (26 U.S.C. § 4940), penalty taxes on various transactions such as those classified as "self dealing" (26 U.S.C. §§ 4941–4946), and rather rigorous reporting requirements (26 U.S.C. §§ 6033, 6056, 6685, 7207). These regulatory provisions were part of the Tax Reform Act of 1969, Pub.L. No. 91–172, 83 Stat. 487 (codified in scattered sections of 26 U.S.C.). The House Report on that Act explained the reasons for the provisions: "[V]igorous and extensive administration is needed in order to provide appropriate assurances that private foundations will promptly and properly use their funds for charitable purposes." H.R.Rep.No.91–413, 91st Cong., 1st Sess. 19 (1969), U.S.Code Cong. & Admin.News 1969, pp. 1645, 1663; *see also* S.Rep.No.91–552, 91st Cong., 1st Sess. 25–27 (1969), U.S.Code Cong. & Admin.News 1969, p. 1645.

■ Section 501(c)(3) specifies various kinds of organizations that are exempt from federal income tax. Section 509(a) defines a "private foundation" as an organization "described in section 501(c)(3) other than" four specified categories of organizations. For convenience, we refer to these four excepted categories as "nonprivate" organizations. The statutory scheme thus is that an exempt organization is a private foundation unless it comes within one of the four specified exceptions. These four categories of tax-exempt organizations treated as nonprivate organizations are those that Congress believed would be "responsive to the needs of the public." H.R.Rep.No.91–413, 91st Cong., 1st Sess. 41 (1969); S.Rep. No.91–552, 91st Cong., 1st Sess. 57 (1969). Congress reasoned that in these exceptional situations the public at large provides the necessary oversight of tax-exempt organizations, thus making governmental regulation unnecessary. *See Quarrie Charitable Fund v. Commissioner*, 70 T.C. 182, 190 (1978), *aff'd*, 603 F.2d 1274 (7th Cir. 1979).

The category of nonprivate exempt organizations that is pertinent in this case is section 509(a)(3). That section treats as nonprivate an entity that is organized and operated to support other specified organizations that receive substantial public support. The theory is that a close relationship between a supporting organization and another organization that is publicly supported assures adequate oversight of the supporting organization. As a result, there is no need to apply the extensive regulation of private foundations that the Code provides. *See Quarrie Charitable Fund*, 70 T.C. at 190. The theory parallels that of section 509(a)(2), which treats as nonprivate an organization that receives at least a third of its support from the general public or from membership dues and that receives no more than a third of its support from adjusted gross investment income. There, too, the rationale is that an organization dependent on the public for its support, of necessity, will be responsive to the public will.

II.

A. The plaintiff, a nonprofit corporation, was organized by, and has been operated in connection with two other nonprofit organizations, All Souls Church, Unitarian, Non-Profit Housing Corporation ("All Souls Housing") and Change Economic Development Corporation ("Change").

The members of All Souls Unitarian Church ("the Church") formed All Souls Housing in 1971. The Church is located in Washington, D. C., two blocks from an area known as the Fourteenth Street Corridor. In 1968, violent racial riots had devastated the Corridor. The Church organized All Souls Housing as a means of improving the Church's neighborhood by rehabilitating the environs of the Fourteenth Street Corridor. The stated purpose of All Souls Housing is

> to provide the vehicle by which low and moderate income housing may be rehabilitated and/or built new, initially in the 14th Street Community and environs by acting as sponsor or participant in one or more of the many programs outlined by

the local government agencies of the Federal Government, and other institutions with consistent objectives. . . .

All Souls Housing decided that it should work with representatives of the Fourteenth Street community and selected Change as an appropriate vehicle for community participation. Change is a nonprofit corporation formed in 1969 to further economic development in the Upper Cardozo Heights area of Washington, D. C., which generally includes the Fourteenth Street Corridor. All Souls Housing and Change worked together from 1971 until 1975 under a memorandum of understanding to develop housing in the area. In June 1975, the two organizations and a private builder/developer jointly received a commitment from the Department of Housing and Urban Development to provide financial and other aid for the development of a 406-unit housing project in the Fourteenth Street Corridor.

All Souls Housing and Change then organized and incorporated the plaintiff. The plaintiff's purpose stated in its certificate of incorporation is

> [t]o provide housing and related facilities for low and moderate income families and families displaced from urban renewal areas or as a result of governmental action, through what is known as Package One of the D. C. Redevelopment Land Agency, a housing project in the 14th Street Urban Renewal Area, located at 14th Streets and Columbia Road, N. W., Washington, D. C.

The certificate of incorporation limits the plaintiff's membership to individuals who are either members of All Souls Housing or Change or who are approved by the membership of those organizations. The plaintiff has 20 directors, half of whom are selected by All Souls Housing and half by Change. To qualify as a director of the plaintiff, at the time of election one must be a director of either Change or All Souls Housing.

Although the housing project was completed and occupied by the summer of 1978, the plaintiff continues an active role in formulating and implementing operation and management policies for the project, which reflect the community's interest. The plaintiff also provides certain services to the tenants of the development.

B. In 1971 and 1973, respectively, the Internal Revenue Service ("the Service") ruled that All Souls Housing was exempt from federal income taxes under section 501(c)(3) of the Code and was not a private foundation under section 509(a)(1) of the Code. Both the plaintiff and Change subsequently sought similar rulings from the Service. In November 1978, the Service ruled that the plaintiff was not a tax-exempt organization—a ruling it subsequently reversed. See below. Since under the Code an entity cannot be a nonprivate foundation unless it is an exempt organization (see above, pp. 464–465), the Service did not determine the plaintiff's status as a nonprivate organization.

The plaintiff filed the present suit in February 1979, seeking a declaratory judgment that it is both an exempt organization and not a private foundation. The parties moved for summary judgment. Prior to oral argument, the government conceded the exempt-organization issue, and the Service issued a ruling "acknowledging the tax-exempt status of plaintiff." Thus the only issue remaining when we heard oral argument was whether the plaintiff was a private foundation.

At oral argument, the parties informed the court of the pendency of Change's application with the Service for a ruling that it is an exempt organization and not a private foundation. The government conceded that under the governing statutory provisions and regulations, the plaintiff would qualify as a nonprivate organization if the Service ruled that Change was such an entity. Following oral argument in April 1980, we suspended further proceedings in this case until the Service had acted on Change's application for a ruling.

C. On February 6, 1981, the Service issued a letter-ruling, which the government describes as a "proposed" one, in which it

concluded that Change (1) is exempt from federal income taxes under section 501(c)(3), but (2) is a private foundation under section 509(a). The letter-ruling informed Change that it had "the right to protest our ruling in regard to your private foundation status" by submitting a statement within 21 days, that Change also had the right to a conference after it filed its statement, and that if Change did not "protest this ruling in a timely manner, it will be considered by the IRS as a failure to exhaust available administrative remedies." After quoting the statutory provision barring a suit for a declaratory judgment unless the organization has exhausted its administrative remedies within the Service (see below), the letter stated that "[i]f we do not hear from you within 21 days, this ruling will become final and copies will be forwarded to your key District Director." Change did not protest the ruling.

In July 1981, we terminated the suspension of proceedings and directed each party to file an additional brief dealing with the issues raised by the letter-ruling. The parties have done so.

### III.

■ The plaintiff challenges the Service's determination that Change is a private foundation. It presumably seeks a declaratory judgment that Change is not a private foundation and that the plaintiff therefore also is not in that category.[1] Change's failure to exhaust its administrative remedies, however, precludes us from considering the issue.

Section 7428 of the Code, the provision authorizing declaratory judgments relating to the status of organizations as tax-exempt organizations or private foundations, provides in subsection (b)(2):

A declaratory judgment or decree under this section shall not be issued in any proceeding unless the Tax Court, the Court of Claims, or the district court of the United States for the District of Columbia determines that the organization involved has exhausted administrative remedies available to it within the Internal Revenue Service.

Change has not complied with this requirement. Although the letter-ruling gave the organization 21 days within which to protest, informed it that the Service would consider a failure to do so "as a failure to exhaust available administrative remedies," and pointed out that failure to exhaust administrative remedies would bar a court from issuing a declaratory judgment, Change did not file a protest. In its supplemental brief plaintiff neither contends that Change could not have filed a protest nor gives any justification for its failure to do so. Instead, it argues only that filing a protest would have been a "futile act" since the Service fully considered the question before issuing its letter-ruling. But if Change filed a protest, the arguments that plaintiff now makes on the merits to show that Change is not a private foundation might have persuaded the Service to change its view. *See United States v. Tucker Truck Lines,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952).

■ Congress has provided that we cannot grant a declaratory judgment in a case such as this unless the organization has "exhausted administrative remedies available to it within the Internal Revenue Service." This is an unequivocal requirement which we have no authority to waive because of the claim that in a particular case such exhaustion would have served no purpose and would have been futile.

Because we are without authority to review the Service's determination that Change is a private foundation, we must decide whether the plaintiff is not a private foundation even though Change is.

### IV.

■ Preliminarily we consider the government's contention that the failure of

---

**1.** Although Change is not a party to the present litigation, the plaintiff's counsel also handled Change's application to the Service for a ruling. The plaintiff has a strong interest in challenging the ruling that Change is a private foundation. In the circumstances, we think it appropriate to permit the plaintiff to raise that issue.

the plaintiff itself to exhaust its administrative remedies before the Service precludes us from granting a declaratory judgment regarding the plaintiff's status as a private or nonprivate foundation. This argument arises from the following circumstances.

In its original filing with the Service in October 1976, the plaintiff sought only a ruling that it was a tax-exempt organization under section 501(c)(3). In August 1977, however, the plaintiff notified the Service by letter that it also sought a ruling on its status as a nonprivate organization under section 509(a)(3). In September 1977, the plaintiff filed a memorandum in support of its claim for nonprivate status.

According to the government, the Service in January 1978, requested by telephone certain information necessary for processing the plaintiff's application. The information requested included the "controlling documents of" and "complete information regarding" Change. The government states that the plaintiff never supplied the material, and it contends that this omission constituted a failure to exhaust administrative remedies.

Even assuming the Service requested information concerning Change (which the plaintiff now disputes), we still would not conclude that the plaintiff failed to exhaust its administrative remedies. First, in response to the January 1978 request, counsel for the plaintiff in March 1978, submitted a nine-page reply, which ended with the statement: "We hope that this information will be responsive to your questions. Please let me know if further information is needed." The Service never requested additional information even though it did not issue its final determination for several months thereafter.

This case is unlike *The Sense of Self Society v. United States,* 44 A.F.T.R.2d 79–5121 (D.D.C.1979), which the government cites. There the court ruled that the plaintiff had failed to exhaust its administrative remedies because it had not responded to the Service's "repeated" requests for information. In the present case, in contrast, the Service made at most only a single request for information. Furthermore, the plaintiff's March 1978 submission informed the Service that the plaintiff believed that it had complied with the Service's request and that plaintiff would submit any further information the Service required. Finally, the reason that the Service failed to rule on the plaintiff's nonprivate status in the November 1978 letter-ruling was not the plaintiff's failure to submit additional information. Instead, apparently it was that because the Service ruled that plaintiff was not a tax-exempt organization, and because section 509(a) applies only to tax-exempt organizations, the question of the plaintiff's status as a private foundation was moot.

We cannot say that under the circumstances the plaintiff's alleged failure to supply additional information constituted a failure to exhaust administrative remedies.

### V.

■ The plaintiff claims to be excepted from the definition of "private foundation" under section 509(a)(3) because of its relationship with All Souls Housing, an organization that is a nonprivate organization under section 509(a)(1). The government, on the other hand, argues that the plaintiff's relationship with Change, a private foundation, prevents plaintiff from qualifying.

To qualify as a nonprivate, supporting organization under section 509(a)(3), an entity must meet three requirements. First, section 509(a)(3)(A) requires that the organization must be "organized, and at all times thereafter . . . operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified" publicly supported organizations. Second, section 509(a)(3)(B) requires the organization to be "operated, supervised, or controlled by or in connection with one or more" publicly supported organizations. Third, section 509(a)(3)(C) excludes organizations that are "controlled directly or indirectly by one or more disqualified persons." The latter section concededly is inapplicable here. We hold that the plaintiff satisfies the other two requirements.

A.  *Section 509(a)(3)(B).*  Because the nature of the relationship between a supporting organization and its publicly supported organization for the purposes of section 509(a)(3)(B) may affect the issue whether the supporting organization is organized and operated exclusively to support the publicly supported organization for purposes of section 509(a)(3)(A), we first consider the section 509(a)(3)(B) issue.

Treasury Regulation § 1.509(a)–4(f) describes three types of relationships between a publicly supported foundation and a supporting organization that qualify for the section 509(a)(3) exception.  The regulations state that:

a supporting organization may be:

(i) Operated, supervised, or controlled by,

(ii) Supervised or controlled in connection with, or

(iii) Operated in connection with one or more publicly supported organizations.

Treas.Reg. § 1.509(a)–4(f)(2) (1980).  Section 1.509(a)–4(f)(3) of the regulations explains that one or more of the relationships must exist in order to insure that:

(i) The supporting organization will be responsive to the needs of [sic] demands of one or more publicly supported organizations; and

(ii) The supporting organization will constitute an integral part of, or maintain a significant involvement in, the operations of one or more publicly supported organizations.

The plaintiff argues that its relationship to All Souls Housing satisfies all three subsections of section 1.509(a)–4(f)(2).  Since we conclude that it meets subsection (iii), we need not decide whether it also satisfies the two other subsections.

In order to establish that an organization is "operated in connection with one or more" publicly supported organizations, section 1.509(a)–4(i) of the regulations states that the organization claiming the exception must meet both a "responsiveness test," described in section 1.509(a)–4(i)(2), and an "integral part test," described in section 1.509(a)–4(i)(3).

1.  *The Responsiveness Test.*  The plaintiff meets the responsiveness test by satisfying subdivision (ii) of the applicable regulation.  Treas.Reg. § 1.509(a)–4(i)(2)(ii). That subdivision requires that the "officers, directors, trustees, or membership of the publicly supported organizations" appoint or elect "one or more officers, directors, or trustees of the supporting organization." All Souls Housing, the publicly supported organization, elects 10 of the plaintiff's 20 directors.  In addition, the government concedes, as the regulations also require, that the "officers, directors, or trustees of the publicly supported organizations [All Souls Housing] have a significant voice in the investment policies [and so forth] . . ." of the supporting organization.

2.  *The Integral Part Test.*  The plaintiff also meets the integral part test.  That test is satisfied if

[t]he activities engaged in for or on behalf of the publicly supported organizations are activities to perform the functions of, or to carry out the purposes of, such organizations, and, but for the involvement of the supporting organization, would normally be engaged in by the publicly supported organizations themselves.

Treas.Reg. § 1.509(a)–4(i)(3)(ii).  As the facts discussed earlier show, the plaintiff is "engaged in" activities "to carry out the purposes" of All Souls Housing, and "but for the involvement" of the plaintiff, All Souls Housing "would normally be engaged" in those activities itself.

The government argues, however, that we should depart from the unambiguous language of the regulations because the legislative history of section 509(a)(3)(B) allegedly shows that under that section Congress intended to except from the definition of private foundation only organizations that are operated exclusively in connection with publicly supported organizations.  It contends that an organization that is "operating in connection with" both a publicly supported organization and a nonpublicly supported organization (as Change must be

viewed in light of the Service's denial of its claim to be a nonpublic foundation) can never satisfy either the statute or the regulation.

Neither the language of the statute nor of the regulation even suggests that limitation on their applicability. The regulation refers only to an organization "operating in connection with one or more publicly supported organizations," which parallels the statutory language of "one or more organizations described in paragraph (1) or (2)." If Congress had intended to limit the reach of the statute to organizations operated in conjunction with only publicly supported organizations, it easily could and presumably would have said so. Moreover, one would have expected the government, as the draftsman of the "fantastically intricate and detailed" regulations under section 509(a)(3) (*Windsor Foundation v. United States*, 40 A.F.T.R.2d 77–6004, 77–6006 (E.D.Va.1977)), to include the concept of exclusivity if the government then believed that Congress so intended. The failure of the regulation to do so is strong indication that, at least at the time of drafting, the government did not interpret the intent of Congress as it now does.

Moreover, the legislative history is far from clear. The government relies on the following statement in the Conference Committee Report:

> The conference substitute . . . follows the Senate amendment except that it provides that an organization which meets all of the tests of . . . [section 509(a)(3)] except that it is operated in connection with two or more specific organizations may qualify where *all of the specific organizations* are . . . [publicly supported].

H.Conf.Rep.No.91–782, 91st Cong., 1st Sess. 289 (1969), U.S.Code Cong. & Admin.News 1969, p. 2403 (emphasis added). That statement, however, must be read in the context of the problem with which the Conference Committee dealt. Thus viewed, the statement does not have the meaning the government ascribes to it.

The House version of section 509(a)(3)(B) (H.R. 13270, 91st Cong., 1st Sess. § 101(a) (1969)) covered an organization operated "in connection with one [publicly supported] organization." The Senate substitute version of H.R. 13270 amended section 509(a)(3) (section 101(a) of the bill) to cover an organization operated "in connection with one [publicly supported] organization (or more than one [publicly supported] educational institution)." The present version of the section adopted by the Conference Committee was designed to broaden both the House and the Senate versions. It did so by eliminating the limitations to a single publicly supported organization and to a single category of publicly supported organizations, namely, educational institutions.

In making these changes, the Conference Committee naturally dealt with the problem the House and Senate bills had raised, namely, the limitation to a single publicly supported organization (House) and to a single category of publicly supported organizations (Senate). It was therefore natural that in explaining its action the Conference Committee referred to the situation where "all" of the related organizations were publicly supported, *i.e.*, that the provision was not restricted to publicly supported *educational* institutions. There is no indication in the conference report that in changing section 509(a)(3)(B) the Conference Committee intended to do anything other than merely eliminate unnecessary limitations on the scope of the supporting organization exception.

The Conference Committee did not consider the situation of an organization that operated in conjunction with two organizations, only one of which was publicly supported. We do not read the few words in the Conference Report upon which the government relies as showing an intent to limit the reach of section 509(a)(3)(B) to entities that operated in conjunction with only publicly supported organizations. The legislative history does not reflect so clearly a congressional intent to limit the statute in this way as to warrant departure from the unambiguous language of the statute and the regulation.

We conclude that plaintiff was "operated in connection with one or more publicly supported organizations" (i.e., All Souls Housing) within the contemplation of section 509(a)(3)(B) of the Code.

**B.** *Section 509(a)(3)(A).* The government also argues that section 509(a)(3)(A) of the Code precludes plaintiff's qualification as a nonprivate, supporting organization. That subsection's implementing regulations, Treas.Reg. §§ 1.509(a)–4(c), (d), and (e), establish "organizational" and "operational" tests. If a tax-exempt organization meets both tests, it is deemed to be "organized and operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified" publicly supported organizations under section 509(a)(3)(A). We hold that plaintiff qualifies under both tests.

1. *Organizational.* The "organizational" test of Treasury Regulation §§ 1.509(a)–4(c), (d) requires that the articles of organization of a supporting organization (i.e., the plaintiff): (1) limit the purposes of the organization to the purposes specified in section 509(a)(3)(A) of the Code; (2) designate the publicly supported organization on whose behalf the organization is to be operated; and (3) do not "expressly empower the organization to operate to support or benefit any organization other than the specified publicly supported organization." The plaintiff's articles of incorporation satisfy all three requirements.

First, the regulations require that a supporting "organization's purposes, as stated in its articles, may be as broad as, or more specific than, the purposes set forth in section 509(a)(3)(A)." Treas.Reg. § 1.509(a)–4(c)(2). The permissible purposes set forth in section 509(a)(3)(A) are "[to] benefit ..., to perform the functions of, or to carry out the purposes of one or more" publicly supported organizations. While articles of organization that, for example, state an organization is organized "for the benefit of X [i.e., a publicly supported organization]" satisfy this part of the organizational test, the regulations do not mandate the use of

any particular language in the articles. *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626, 635–37 (1980); *Goodspeed Scholarship Fund v. Commissioner*, 70 T.C. 515, 520–21 (1978); *cf. Elisian Guild, Inc. v. United States*, 412 F.2d 121, 123–24 (1st Cir. 1969); Rev.Rul. 75–437, 1975–2 Cum.Bull. 218. Rather the articles of organization merely must limit, expressly or by implication, a supporting organization's purposes to benefitting, performing the functions of, or carrying out the purposes of one or more publicly supported organizations.

The plaintiff's articles of incorporation state that its purposes are "[t]o provide housing and related facilities ..." through a specific housing development in a designated area of the Fourteenth Street Corridor. Because the effectuation of this project results only in the "carry[ing] out" of a specific aspect of the stated purposes of All Souls Housing and because there is an historic relationship and identity of interest between the plaintiff and All Souls Housing (see below), the plaintiff's articles of incorporation sufficiently limit the plaintiff's functions for the purposes of the regulations. *See Goodspeed Scholarship Fund*, 70 T.C. at 521.

Second, although the plaintiff's articles of incorporation do not designate All Souls Housing as the organization the plaintiff will support, the plaintiff nevertheless qualifies under Treasury Regulation § 1.509(a)–4(d)(2)(iv). Subdivision (iv) provides that the publicly supported organization need not be specified where there has been "an historic and continuing relationship" between the supporting organization and the publicly supported organization that has resulted in "a substantial identity of interest between such organizations."

All Souls Housing was an organizer of the plaintiff, and the plaintiff's only activities have been the development, maintenance, and support of a specific project that All Souls Housing initiated and in which All Souls Housing maintains an on-going interest. The plaintiff's name even incorporates that of All Souls Housing. Nothing in the

statute or regulations indicates that the fact that the plaintiff also has become identified with Change vitiates or renders irrelevant the plaintiff's historic relationship and identity of interest with All Souls Housing.

The government argues that the plaintiff and All Souls Housing could not have an historic relationship since the plaintiff was not organized until late 1975. The concept of "historic" in the regulation, however, relates to the history of the specific organizations and does not require that the relationship must have existed for any specified time. The plaintiff and All Souls Housing have been closely associated since the plaintiff was formed, and both have served the same objective. There has been "an historic and continuing relationship" between the plaintiff and All Souls Housing that has resulted in "a substantial identity of interest" between the two organizations, within the meaning of subdivision (iv) of Treasury Regulation § 1.509(a)–4(d)(2).

Third, the plaintiff's articles of incorporation do not "expressly empower" it to support any organization other than All Souls Housing. Indeed, those articles do not "expressly" empower the plaintiff to support or benefit any specific organization. More importantly, however, the articles empower the plaintiff to undertake solely activities that will benefit All Souls Housing directly. That is, the articles permit the plaintiff only to participate in a housing development that carries out the purposes of All Souls Housing. It is immaterial that the plaintiff's activities in supporting All Souls Housing coincidentally also benefit Change (see the discussion at section V B 2, *infra*). *Cf. Goodspeed Scholarship Fund*, 70 T.C. at 521–24.

2. *Operational.* Treasury Regulation section 1.509(a)–4(e) states that "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organization ... *only* if it engages *solely* in activities which support or benefit the specified publicly supported organizations." (Emphasis added.) The government argues

that, in light of example (3) under that regulation, this language "make[s] it clear that if the supporting organization supports, even to a minor extent, an organization which is not publicly supported," the supporting organization will not qualify under section 509(a)(3)(A) of the Code.

The regulation, however, does not limit a supporting organization to one that "engage[s] solely in activities which benefit or support *only* the specified publicly supported organizations." Instead, the regulation merely requires that the supporting organization refrain from engaging in any activity that does not directly support or benefit the specified nonprivate organization. A supporting organization that meets that requirement satisfies the regulation even though some nonpublicly supported organization simultaneously benefits, directly or indirectly, from the operation of the supporting organization. *Cf. Goodspeed Scholarship Fund*, 70 T.C. at 521 (dictum).

Example (3) of Treasury Regulation § 1.509(a)–4(e) is too ambiguous to support the government's interpretation of the regulation. In that example, a supporting organization ("P") is organized to provide financial assistance to a specified, publicly supported organization ("S") that aids underdeveloped countries. P, however, makes a "small, general purpose grant" to a private foundation ("T") that carries out a function that "assists in the overall aid program carried on by S." According to the example, the grant to T prevents P from complying with the operational test.

The rationale of example (3), at least in the present context, is unclear. Did P fail the operational test because T was benefitted directly by the grant or because S did not benefit directly from the grant? While the former reason supports the government's argument, the latter reason more clearly comports with the language of the statute and the regulations as applied to these facts. Under the latter reason, example (3) is inapposite to the present case.

The plaintiff here does not provide financial support to All Souls Housing. If it did and if the plaintiff also made separate

grants to Change, the government's argument might be convincing because the grants to Change would not benefit All Souls Housing directly. The plaintiff, however, is operated to implement the stated purposes of All Souls Housing and Change, and when the plaintiff benefits one, it necessarily benefits the other equally. If the facts in example (3) were changed so that P were operated to provide technical assistance to farmers in underdeveloped nations, the fact that this assistance benefitted T (by furthering its stated goals) as well as S would not necessarily prevent P's qualification under the operational test.

According to our reading of Treasury Regulation §§ 1.509(a)–4(c), (d) and (e), the plaintiff qualifies under the organizational and operational tests. It therefore qualifies under section 509(a)(3)(A) of the Code.

C. Finally, in an about-face from its arguments in *Windsor Foundation v. United States*, 40 A.F.T.R.2d 77–6004 (E.D.Va. 1977), the government seemingly suggests that we should hold that the plaintiff is a private foundation based upon policy and the spirit of the law. Both the policy and spirit of the Tax Reform Act of 1969, according to the government, limit the "supporting organization" exception of section 509(a)(3) to those tax-exempt organizations that support or benefit only specified publicly supported organizations and that are controlled solely by publicly supported organizations.

Here, as in the situation we previously discussed (*supra,* pp. 472–473), the intricate and detailed regulations do not state that a tax-exempt organization cannot qualify under section 509(a)(3) if its activities provide support or benefit in any way to a private foundation. We decline to deviate from the regulations as written on the basis of amorphous notions of policy and the law's "spirit." *See Windsor Foundation*, 40 A.F.T.R.2d at 77–6006.

In any event, we cannot conclude that the "spirit" of the law calls for denial of the plaintiff's claim that it is not a private foundation. The government has pointed to nothing in the legislative history indicat-

ing that Congress would have found plaintiff ineligible for the supporting organization exception of section 509(a)(3) if Congress had been confronted with the facts before us. Congress primarily was concerned with assuring that tax-exempt organizations, not subject to the private-foundation provisions of the Tax Code, would be responsive to the public. The government has not established that the plaintiff's relationship to Change diminishes the responsiveness to the public provided by the plaintiff's relationship to All Souls Housing.

In a case the government cites, *Quarrie Charitable Fund v. Commissioner*, 70 T.C. 182 (1978), *aff'd*, 603 F.2d 1274 (7th Cir. 1979), the Tax Court examined thoroughly the legislative history of section 509(a)(3) in a different factual context. It noted the importance Congress placed upon public scrutiny of organizations excepted from the definition of "private foundation," and stated:

In the case of supporting organizations described in section 509(a)(3), the public scrutiny derives from the publicly supported beneficiaries, which, in turn, oversee the activities of the supporting organization. The provisions of section 509(a)(3) and the regulations thereunder are designed to assure that the publicly supported beneficiaries of a section 509(a)(3) organization have both the ability and the motivation to do so.

70 T.C. at 190.

In the present case, the government has not shown that the plaintiff's relationship with Change deprives All Souls Housing of the "ability and motivation" to oversee the plaintiff's activities.

The plaintiff satisfies the requirements of the Code and the regulation that defines the qualifications of an exempt organization excepted from classification as a private foundation, and it is entitled to a declaratory judgment that it is such an entity.

In so holding, we decide only that on the particular facts before us and the particular regulations we have applied, the plaintiff qualifies as a nonprivate organization under

section 509(a)(3) of the Code. We intimate no opinion on the status of any other tax-exempt organization—no matter what may be its similarities to the plaintiff—as an excepted organization under section 509(a)(3).

## CONCLUSION

The plaintiff's motion for summary judgment is granted, and the defendant's motion for summary judgment is denied. We declare that Change-All Souls Housing Corporation is not a private foundation under section 509(a)(3) of the Internal Revenue Code of 1954.