ROE FOUNDATION CHARITABLE TRUST, STAN A. LONG, TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roe Found. Charitable Trust v. Comm'r
Docket No. 46959-86X. United States Tax Court
T.C. Memo 1989-566; 1989 Tax Ct. Memo LEXIS 579; 58 T.C.M. (CCH) 402; T.C.M. (RIA) 89566; October 19, 1989. *579 P is a charitable trust created to provide assistance to the needy aged of Washington State. The Commissioner determined that P was a private foundation and not a supporting organization as defined in sec. 509(a)(3). Held: Since P is not "operated in connection with" a publicly supported charity as required by sec. 509(a)(3)(B) and sec. 1.509(a)-4(1), Income Tax Regs., P is not a supporting organization within the meaning of sec. 509(a)(3) and is therefore a private foundation. Stan A. Long, pro se. Larry N. Johnson, for the respondent. CLAPP
MEMORANDUM OPINION CLAPP, Judge: The Roe Foundation Charitable Trust (Roe Foundation or petitioner) is a foundation described in section 501(c)(3) and exempt from taxation under section 501(a). Petitioner is a private foundation as defined in section 509(a). [1] Petitioner brought an action under section 7428 [2] *580 for declaratory judgment that it is not a private foundation because it is an organization described in section 509(a)(3). The case was submitted upon the basis of the pleadings and the facts recited in the administrative record, which are assumed to be true for the purposes of this opinion. See Rules 122(a) and 217. Petitioner filed its Form 1023, Application for Recognition of Exemption (Form 1023), with the district office of the Internal Revenue Service in Seattle, Washington. Petitioner was established on or about January 1, 1983, and was funded with a $10 donation from Raymond O. and Evelyn A. Sawyer (Sawyers), who have provided in their wills that their estate of approximately $1 million will pass to the trust upon their deaths. Copies of the Sawyers' wills are not in the record. Since 1983, no additional funds have been donated. In addition to the expectancy under the Sawyers' wills, petitioner, if it receives its section 509(a)(3) exemption, also expects to be funded from public contributions. Petitioner's creators and trustees at all times relevant to this case were the Sawyers, Stan A. Long, an accountant, and Maggie Ellis, then the annual president-elect of the Washington Community Action *581 Agencies (WCAA). The WCAA is a consortium of salaried state agency executive directors who administer the daily needs of the Washington area charities, although not exclusively those which represent the needy aged. The annual president-elect of the WCAA will act as a trustee for the Roe Foundation. An attorney, Stephen Hansen, was listed as a trustee on the Form 1023 dated January 19, 1983, but unlike the other designated trustees, his signature does not appear on the trust instrument. Moreover, he was not listed as a trustee on the later submitted Form 1023 dated December 19, 1984. The trust instrument provides in pertinent part that it is organized solely for charitable purposes and on its Form 1023 describes that its intended activity is "to supply funds, aid and assistance to aged persons who are poor and distressed and who are residents of the State of Washington," and that the funds, aid, and assistance will be given based on referrals from churches, senior citizens groups, and the WCAA. Petitioner's trust instrument authorizes the following distributions of principal and income: Third: A. The principal and income of all property received and accepted by the trustees to *582 be administered under this Declaration of Trust shall be held in trust by them, and the trustees may make payments or distributions from income to or for the use of such charitable organizations, within the meaning of that term as defined in paragraph C, in such amounts and for such charitable purposes of the trust as the trustees shall from time to time select and determine; and the trustees may make payments or distributions from income directly for such charitable purposes, within the meaning of that term as defined in paragraph D, in such amounts as the trustees shall from time to time select and determine without making use of any other charitable organization. No part of the net earnings of this trust shall inure or be payable to or for the benefit of any private shareholder or individual, and no substantial part of the activities of this trust shall be the carrying on of propaganda, or otherwise attempting to influence legislation. No part of the activities of this trust shall be the participation in, or intervention in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. * * * C. In this Declaration *583 of Trust and in any amendments to it, references to "charitable organizations" or "charitable organization" mean corporations, trusts, funds, foundations, or community chests created or organized in the State of Washington, organized and operated exclusively for charitable purposes, no part of the net earnings of which inures or is payable to or for the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which do not participate in or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. It is intended that the organization described in this paragraph C shall be entitled to exemption from Federal income tax under section 501(c)(3) of the Internal Revenue Code of 1954, as now in force or afterwards amended. The trust provides that any trustee may resign his office, but that the number of trustees may not fall below three. A trustee may, by written instrument, delegate all or part of his powers to another trustee for any period and subject to conditions determined by the *584 delegating trustee. On January 19, 1983, petitioner filed with respondent a Form 1023 requesting recognition of exemption from Federal income taxes under section 501(c)(3) and seeking a determination that it is classified as a supporting organization described in section 509(a)(3). On April 30, 1983, respondent discontinued consideration of petitioner's January 19, 1983, exemption application without making a determination because of petitioner's failure to provide adequate information and otherwise exhaust administrative remedies. On December 19, 1984, petitioner resubmitted an undated and unsigned Form 1023 again requesting exemption under section 501(c)(3) and nonprivate foundation classification under section 509(a)(3). On June 5, 1985, respondent determined petitioner was exempt from Federal income tax under section 501(c)(3), but determined that petitioner was a private foundation within the meaning of section 509(a). On June 12, 1985, petitioner appealed the determination of its classification as a private foundation, claiming it qualified for supporting organization status under section 509(a)(3). On September 10, 1986, respondent issued its final adverse determination *585 to petitioner as to its private foundation classification based on the following reasons: You fail to meet section 509(a)(3)(A) of the Internal Revenue Code because you are not organized and at all times thereafter operated, exclusively for the benefit of, or to perform the function of, or carry out the purposes of one or more specified organizations; and, You fail to meet section 509(a)(3)(B) of the Code because you are not operated, supervised, or controlled by or in connection with one or more organizations described in section 509(a)(1) or (2). You also fail to meet the integral and responsiveness test described in the regulations at section 1.509(a)-4(i); and, You fail to meet section 509(a)(3)(C) of the Code because you are directly and indirectly controlled by one or more disqualified persons. Petitioner then brought this action under section 7428 for a declaratory judgment. The sole issue is whether petitioner is an organization described in section 509(a)(3)[3] *586 *587 and, therefore, not a private foundation pursuant to section 509(a). All section 501(c)(3) organizations are private foundations except those specified in section 509(a)(1) through (4). Petitioner claims that it is excluded from private foundation status because it is a supporting organization described by section 509(a)(3). The theory for creating this exception to private foundation status was that a close relationship between *588 a supporting organization and another organization that is publicly supported insures adequate oversight of the supporting organization. As a result, there is no need to apply the extensive regulation of private foundations that the Code provides. Quarrie Charitable Fund v. Commissioner,70 T.C. 182, 190 (1978), affd. 603 F.2d 1274 (7th Cir. 1979). In order to qualify as a supporting organization an entity must meet all of three requirements. First, section 509(a)(3)(A) requires that the organization must be "organized, and at all times thereafter * * * operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified" publicly supported organizations. Second, section 509(a)(3)(B) requires the organization to be "operated, supervised, or controlled by or in connection with one or more" publicly supported organizations. Third, section 509(a)(3)(C) excludes organizations that are "controlled directly or indirectly by one or more disqualified persons." Petitioner argues that it satisfies all three requirements. Respondent argues to the contrary. Petitioner has the burden of proving that respondent's determination of private *589 foundation status was incorrect. Rule 142(a). To do this, petitioner must establish that it satisfies the requirements of section 509(a)(3)(A), (B), and (C). Because the relationship between a supporting organization and its publicly supported organization for the purposes of section 509(a)(3)(B) may affect the issue of whether the supporting organization is organized exclusively to support the publicly supported organization pursuant to section 509(a)(3)(A), we first consider the section 509(a)(3)(B) issue. See Cockerline Memorial Fund v. Commissioner,86 T.C. 53, 58 (1986); Change-All Souls Housing Corp. v. United States,229 Ct. Cl. 380, 671 F.2d 463, 469 (1982). Section 509(a)(3)(B) describes the nature and quality of the relationship that must exist between the supporting organization and the publicly supported organization. Section 1.509(a)-4(f)(2), Income Tax Regs., [4] sets forth three different types of relationships, one of which must be met in order to qualify for the section 509(a)(3) exception. Thus, a supporting organization may be (1) operated, supervised, or controlled by, (2) supervised or controlled in connection with, or (3) operated in connection with, one or *590 more publicly supported organizations. Section 1.509(a)-4(f)(3), Income Tax Regs., provides that any one or more of these relationships must exist to insure that the supporting organization will (1) be responsive to the needs or demands of one or more publicly supported organization and (2) will constitute an integral part of, or maintain a significant involvement in, the operations of one or more publicly supported organizations. "Operated, supervised, or controlled by" section 1.509(a)-4(f)(2)(i), Income Tax Regs.
Petitioner concedes it is not "operated, supervised, or controlled by" WCAA within the meaning of section 1.509(a)-4(f)(2)(i), Income Tax Regs.
"Supervised or controlled in connection with" section 1.509(a)-4(f)(2)(ii), Income Tax Regs.
Under this relationship test, there must be common supervision or control by the persons supervising or controlling both the supporting organization and the publicly supported *591 organization. This is generally established by the control or management of each organization being vested in the same persons. "In such a situation, the supporting and publicly supported organizations are compared to brother and sister organizations subject to common control. Sec. 1.509(a)-4(h)." Cockerline Memorial Fund v. Commissioner,86 T.C. at 59. Respondent argues that the record fails to show who the persons are that control or manage the purported publicly supported organizations or that these persons are the same persons who control or manage petitioner. Respondent contends that petitioner has failed to establish in the record (1) who controls or manages the WCAA executive directors, (2) what relationship that organization has to the WCAA which petitioner purports to support, and (3) whether petitioner's trustees also control or manage these supported organizations. Petitioner states that this special relationship exists pursuant to the regulation because the president-elect of the WCAA, whose agencies the foundation is assisting, will serve on petitioner's board of trustees. Petitioner contends that the Roe Foundation first made its intentions known to the State's Community *592 Action Agencies almost 6 years ago when the trust was organized and Maggie Ellis, the then president-elect of the agency's executive board, became a trustee. Petitioner continues that the trust will assist the State of Washington to aid its needy aged by donating funds to the state agencies who administer these programs and are funded by the state, and that Maggie Ellis' willingness to serve as a trustee, who will have full voting power on all matters, is sufficient to create a common supervision or control. We do not believe that petitioner's relationship with the WCAA constitutes the type of common supervision or control envisioned by section 1.509(a)-4(f)(2)(ii) and (a)-4(h), Income Tax Regs. The regulations specifically state that in the case of a supporting organization which is "supervised or controlled in connection with" the "distinguishing feature is the presence of common supervision or control among the governing bodies of all organizations involved, such as the presence of common directors." Sec. 1.509(a)-4(f)(4), Income Tax Regs. See also sec. 1.509(a)-4(h)(1), Income Tax Regs.[5] *593 The Roe Foundation's relationship to WCAA falls short of the close relationship necessary to meet this test. This conclusion is highlighted by an example provided in the regulations. In Example (1), a philanthropist who has founded a school set up a trust into which he transferred all of the operating assets of the school, together with a substantial endowment for it. Under the trust, the same persons who control and manage the school also control and manage the trust. Under the circumstances, the trust is organized and operated for the *594 benefit of the school and is "supervised or controlled in connection" with such organization under section 509(a)(3). The fact that the same persons control the school and the trust insures the trust's responsiveness to the school. See section 1.509(a)-4(h)(3), Example (1), Income Tax Regs. The mere presence of one trustee on petitioner's board from the WCAA fails to rise to the level of responsiveness required. We have no indication to what extent the president-elect will be in contact with each of the intended beneficiaries of the trust funds (i.e., the community organizations). Finally, nowhere is it indicated whether representatives from the individual beneficiaries of petitioner will be involved in any way with the Roe Foundation. Absent common control or management of the supported and supporting organizations, petitioner's relationship to the WCAA does not fall within section 1.509(a)-4(f)(4) and (a)-4(h), Income Tax Regs. We therefore next review whether the Roe Foundation is "operated in connection with" WCAA. "Operated in connection with" section 1.509(a)-4(f)(2)(iii), Income Tax Regs.
Section 1.509(a)-4(f)(4), Income Tax Regs., provides that the distinguishing feature *595 of the "operated in connection with" relationship is that the supporting organization is responsive to, and significantly involved in the operations of, the publicly supported organization as described in section 1.509(a)-4(i), Income Tax Regs. A supporting organization can satisfy this relationship test only if it meets the "responsiveness test" defined in section 1.509(a)-4(i)(2), Income Tax Regs., and the "integral part test" defined in section 1.509(a)-4(i)(3), Income Tax Regs. See section 1.509(a)-4(i)(1)(i), Income Tax Regs. It is the "operated in connection with" test that appears to be petitioner's primary basis for asserting its section 509(a)(3) status. 1. Responsiveness test
The "responsiveness test" is designed to insure that the supported organization will have the ability to influence the activities of the supporting organization. The "responsiveness test" can be met by one of two alternative methods. The first method of satisfying the responsiveness test is set out in section 1.509(a)-4(i)(2)(ii), Income Tax Regs., and is quite direct. This method requires the supporting organization to demonstrate that one of the following arrangements exist: (a) One or more officers, *596 directors, or trustees of the supporting organization are elected or appointed by the officers, directors, trustees, or membership of the publicly supported organizations; (b) One or more members of the governing bodies of the publicly supported organizations are also officers, directors, or trustees of, or hold other important offices in, the supporting organization; or (c) The officers, directors, or trustees of the supporting organization maintain a close and continuous relationship with the officers, directors, or trustees of the publicly supported organization. Once one or more of the arrangements have been shown, petitioner must demonstrate that by reason of such arrangement the officers, directors, or trustees of the publicly supported organization have a "significant voice in the investment policies of the supporting organization, the timing of grants, the manner of making them * * * and in otherwise directing the use of the income or assets of such supporting organization." See sec. 1.509-4(i)(2)(ii)(d). The word "significant" means "likely to have influence," not control. See Cockerline Memorial Fund v. Commissioner,86 T.C. at 60. The alterative method of satisfying the *597 "responsiveness test" provided by section 1.509(a)-4(i)(2)(iii), Income Tax Regs., requires that: (a) The supporting organization is a charitable trust under State law; (b) Each specified publicly supported organization is a named beneficiary under such charitable trust's governing instrument; and (c) The beneficiary organization has the power to enforce the trust and compel accounting under State law. Petitioner does not satisfy the first alternative to the responsiveness test. Although petitioner in its governing body includes the president-elect of the WCAA, the record fails to specify the exact role she will play in the foundation's policy making or in the selection of recipients of grants from the Roe Foundation. Petitioner has failed to indicate how the WCAA trustee will have a "significant" voice in any of the trust's activities and, in particular, in petitioner's investment policies or in directing the use of its income. In its application for exemption, petitioner states that "funds, aid, and assistance to aged, poor and distressed persons will be given based on referrals from churches, senior citizens groups, and the Washington Community Action Agencies." It thus appears *598 the WCAA publicly supported organizations will provide only some of the referrals, but the ultimate decision of who receives the aid and how much aid will be made by petitioner's trustees, only one of whom directly represents the interests of the publicly supported organizations. The record clearly illustrates this fact. The president-elect of the WCAA has only one out of a possible four votes. Petitioner alleges that there are five trustees, the fifth presumably being an attorney, Steve Hansen, such that the Sawyers will not have two of the four votes and not control the decision making of the trust. Petitioner's later Form 1023, however, fails to validate this as it omits Steve Hansen as a trustee. Moreover, his name does not appear on the trust document. In any case, the focus is not on whether the Sawyers have control but whether the supporting organization's representatives are "likely to have influence." Under the facts presented, we think not. Additionally, the trust fails to safeguard the WCAA's role in the trust's decision making activities. The fifth paragraph of petitioner's trust instrument specifically allows one of the four trustees to resign without the appointment *599 of a new trustee, as long as petitioner has at least three trustees. Nowhere does the trust condition that a WCAA representative must always serve as a trustee. Thus, a time may come when no public charity individual is active on the trust committee. The facts on this record do not illustrate that the WCAA trustee has and will continue to have a significant voice in the foundation affairs. Petitioner fails to satisfy the second alternative of the "responsiveness test." Although petitioner is a charitable trust under Washington State law, the second and third requirements of section 1.509(a)-4(i)(2)(iii), Income Tax Regs., are not met because petitioner's trust instrument fails to specifically name as beneficiaries any publicly supported organizations, and because under Washington State law of charitable trusts, the state's attorney general, not the beneficiaries (even assuming they are specifically identified), has the power to enforce the trust and compel an accounting, see Wash. Rev. Code Ann. sec. 11.110.090 et seq. (1986). Petitioner argues that it meets the second alternative of the "responsiveness test" because the State of Washington is the named beneficiary, and the state *600 has the power to enforce the trust through the state's attorney general. Petitioner argues that a broad reading of this section is necessary since the requirements of this section are met "when the language of the governing instrument is sufficiently unambiguous to leave no doubt as to the supported organization intended to be benefitted," citing Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. 626, 635 (1980), and Goodspeed Scholarship Fund v. Commissioner,70 T.C. 515 (1978). These cases, however, deal with a different set of facts than is presented before us. In Goodspeed Scholarship Fund v. Commissioner,70 T.C. at 520, a will provided that the net income of a charitable trust be used for paying "the education * * * at Yale College of such graduates of Duxbury, Massachusetts, High School" as were chosen according to the procedures set forth in the will. Respondent argued that the governing instrument failed to name a publicly supported organization for purposes of the "organizational test" of section 1.509(a)-4(c)(1), Income Tax Regs., because the pupils themselves were clearly not within this meaning, and the trust was therefore a private foundation. We held that although *601 the document failed to use the magic language "for the benefit of Yale University" because it was clear that this was the intent of the will language, the trust was a supporting organization under section 509(a)(3). 70 T.C. at 524. In Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. at 628, the trust instrument stated that the income from the trust would be used each year "to finance, or aid in financing, the education of a pupil or pupils * * * from the * * * Winterset Community High School of Winterset, Iowa * * * to assist any of the eligible * * * graduates in attending any college or university * * * within the state of Iowa." In Callahan, we applied the same rationale to the "responsiveness test." We based our decision in part on Rev. Rul. 75-436, 1975-2 C.B. 217, which states: In granting scholarships to the graduating class of the public high schools, the trust is benefiting individual members of the charitable class benefited by the city [a sec. 170(c)(1) organization] through its public school system. Thus, the requirement of section 1.509(a)-4(e) of the regulations that the supporting organization be operated exclusively to support or benefit one or more publicity *602 supported organizations is also satisfied. If, pursuant to the "operational test" of section 509(a)(3)(B), the payments to the high school students comprised an activity benefitting the school, then the high school should similarly be a named beneficiary under the "responsiveness test" because the "municipality (of which Winterset Community High School * * * is an integral part) * * * [was], the beneficiary organization * * *." Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. at 636. The Court noted that: Under section 1.509(a)-4(e), Income Tax Regs., the making of payments to graduates of Winterset High School constitutes an activity which supports or benefits the high school for purposes of the operational test. * * * See sec. 1.509(a)-4(e)(1) and (2), Income Tax Regs. We fail to perceive the rationale underlying any different results in the operational test and the one before us. If, under the regulations, the making of payments to the high school graduates comprises an activity which benefits the high school for purposes of the operational test, then the high school should similarly be considered a named beneficiary under subdivision (iii) of the responsiveness test. *603 [Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. at 636.] We also determined that under the relevant state law, the trustees would be accountable to the local district court and required to make detailed annual report to the court, which would become part of the public record. The records could be examined by the school district in the event of default by the trustees. We do not, however, find that the "responsiveness test" is met in the instant case. By stating that the Roe Foundation trust will make payments to "charitable organizations" defined as "corporations, trusts, funds, foundations, or community chests created or organized in the State of Washington, organized and operated exclusively for charitable purposes," it fails to include as a named beneficiary any specified publicly supported organization. The State of Washington is not a properly named beneficiary because it leaves doubt as to the precise supported organizations intended to be benefitted. The fact that Washington State is a section 170(c)(1) organization does not remedy this defect. This section requires a showing that the supported organizations will have the ability to influence petitioners. To *604 simply state that the WCAA and the State of Washington are one and the same for purposes of the "responsiveness test," goes beyond the "broad reading of the section" required under the case law. In each of the cited cases, a specific school and a specific graduating class were listed and the intended beneficiary. In this case, there are not enough facts to determine the intended beneficiaries. Had petitioner specifically named the WCAA in the trust instrument, it is still unclear whether this would strengthen petitioner's position. The record gives no indication whether the WCAA is a publicly supported organization or just the coordinator of the organizations which are publicly supported. 2. Integral part test
Section 1.509(a)-4(i)(3)(i), Income Tax Regs., provides that a supporting organization will be considered to meet the "integral part test" if it maintains a significant involvement in the operations of one or more publicly supported organizations and such publicly supported organizations are in turn dependent upon the supporting organization for the type of support which it provides. In order to meet this test, section 1.509(a)-4(i)(3)(ii) or (iii), Income Tax Regs., must *605 be satisfied. Section 1.509(a)-4(i)(3)(ii), Income Tax Regs., sets forth the first of the two ways in which the "integral part test" may be satisfied. Under this rule, the test will be satisfied if the activities engaged in for or on behalf of the publicly supported organizations are activities to perform the functions of, or to carry out the purposes of such organizations, and butfor the involvement of the support organization, would normally be engaged in by the publicly supported organizations themselves. This rule generally applies only to situations where the supporting organization actually engages in activities that benefit the supported organization, such as performing a specific function for one or more publicly supported organizations. Sec. 1.509(a)-4(i)(3)(ii) and (a)-4(i)(5), Examples (1), (2), and (3), Income Tax Regs.
Section 1.509(a)-4(i)(3)(iii)(a), Income Tax Regs., sets forth the second way in which the "integral part test" may be satisfied. Under this rule, the test will be satisfied if: (iii)(a) The supporting organization makes payments of substantially all of its income to or for the use of one or more publicly supported organizations, and the amount of support *606 received by one or more of such publicly supported organizations, is sufficient to insure the attentiveness of such organizations to the operations of the supporting organization. In addition, a substantial amount of the total support of the supporting organization must go to those publicly supported organizations which meet the attentiveness requirement * * *. All pertinent factors must be considered in determining whether the amount of support received by the publicly supported beneficiary organizations is sufficient to insure the attentiveness of such organizations to the operation of the supporting organization. These factors include the number of beneficiaries, the length and nature of the relationship, and the purpose to which the funds are put. Generally, the attentiveness of a beneficiary organization is motivated by reason of the amounts received from the supporting organization. The more substantial the amount involved as a percentage of the supported organization's total support, the greater the likelihood that the required degree of attentiveness is present. Section 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs. The regulations specifically state, however, that in determining *607 whether the amount received will be sufficient to insure attentiveness by the beneficiary organization "evidence of actual attentiveness by the beneficiary organization is of almost equal importance." (Emphasis added.) Section 1.509(a)-4(i)(3)(iii)(d), Income Tax Regs.
The first alternative of the "integral part test" clearly is not satisfied since petitioner has not demonstrated it is engaged in any activities or is performing any functions that, butfor petitioner's involvement, would normally be engaged in by the publicly supported organization. In fact, the administrative record does not present any facts which demonstrate any significant involvement by petitioner in the affairs of the WCAA, or in any group of the WCAA. Nowhere in the record has petitioner shown in detail what its functions, purposes, or activities with the WCAA will be. The only functions listed in the Form 1023 are extremely broad, i.e., to provide funds, aid, and assistance to elderly and aged individuals who may be referred to petitioner by the purported publicly supported organizations. While petitioner has presented several letters from local area groups requesting funds for the activities once the trust *608 is set up, petitioner has no funds to provide for the activities until the Sawyers die and pass their estate to the Roe Foundation. With no funds to speak of, petitioner is incapable of performing activities or functions which benefit anyone. Next, petitioner argues it satisfies the second alternative. In order to establish that this second alternative of the "integral part test" is satisfied, the organization must demonstrate that (1) it has income and earnings available for support, (2) the amount of support it provides to each beneficiary organization, and (3) the amount of total support received by each beneficiary organization. Respondent argues that the record in this case fails to establish any of these facts. The sum total of the financial information submitted by petitioner during the administrative process which started on January 19, 1983, shortly after petitioner was organized, and ended on September 10, 1986, the date of the final adverse determination, is as follows: (1) that the total income received by petitioner to the date of the determination was $10, which amount was received from its trustees and organizers, the Sawyers, at the time of the organization of the *609 trust; (2) that funds for support may come from earnings of assets which the Sawyers may eventually (but had not yet at the time of determination) transfer to the trust in an amount which could approximate $1 million; (3) that petitioner anticipated public support during the first 2 years of operations "may well amount to $50,000 or more," when in fact it has shown petitioner had only $10 of support during this 2-year period; and (4) that petitioner's "expected figures" of public support may "well be as high as $50,000 per year" initially and "as much as $120,000 eventually." Respondent points out that petitioner consistently has not provided any detailed financial information requested by respondent during the administrative process. Thus, the record contains no indication of where these projections come from, how they were determined, or how petitioner expects to achieve such optimistic results. Petitioner argues that -- It is ludicrous to label a million dollar trust fund as incapable of producing at least a projected 5% return on investment, $50,000 per year, as ". . . pie in the sky . . . having no basis in reality" and that that sum of money will not "assure attentiveness" by *610 the supported organization especially when * * * [petitioner has received] letters from potential donee agencies practically "begging to be funded either carte blanche or for specific projects." None of the requirements of this test have been established by petitioner. Nowhere in the record are copies of the Sawyers' wills, and petitioner contends elsewhere in the record that the $50,000 is to be received by virtue of public donation, not return on investment. Petitioner is totally contradictory in its contentions. It has not been demonstrated it makes payments of substantially all of its income to the publicly supported organizations or that it will have the income to make any payments at any time in the near future. Petitioner's argument that respondent can always audit it in the future to ascertain whether it operates in compliance with the section 509(a)(3) requirements misses the point that petitioner's application for exemption fails to meet the section 509(a)(3) requirements. While an exemption application often deals with prospective transactions, absent any access to the Sawyers' wills, and absent any detailed information about the individual charities the trust seeks *611 to benefit, or their relationships to the WCAA, we are unable to conclude that any funds other than currently nonexistent public funds will ever find their way into the Roe Foundation's war chest or where these funds will actually go. The organizations requesting aid were all under the impression that petitioner would shortly be funded by the Sawyers and, of course, would be responsive to letters by petitioner that a trust with over $1 million was to be created. However, no such trust is yet created. The organizations which have met the "integral part test" have all involved situations where an actual trust had been created and funds actually expended for charitable causes. For example, in Cockerline Memorial Fund v. Commissioner,86 T.C. 53 (1986), a scholarship fund was created by a testamentary trust pursuant to a will, and it was shown that substantially all of the income was actually paid to the colleges and universities it sought to benefit, the integral part test was satisfied. It was shown that the scholarship trust insured the attentiveness of the schools, many of which were small institutions and depended on the funds. In Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. 626 (1980), *612 a decedent's will also set up a testamentary trust, which specified that the income of the trust was to be used to provide college scholarships for graduates of the local high school. Due to the small size of the high school, "the awarding of scholarships is an activity that is significant enough to insure that the high school will be attentive to petitioner's operation" within the meaning of section 1.509(a)-4(i)(3)(iii), Income Tax Regs.Nellie Callahan Scholarship Fund v. Commissioner,73 T.C. at 639. In each of these cases, the trust had funds to insure the attentiveness of the supporting organization. In the instant case, it is the promise of funds which attracts the organization's interest. This, however, falls far short of providing the actual attentiveness required to insure adequate monitoring of petitioner's activities. For the reasons stated, petitioner fails the "integral part test" just as it fails the "responsiveness test." We conclude that petitioner was not "operated in connection with one or more publicly supported organizations," within the contemplation of section 509(a)(3)(B). Petitioner's relationship with the WCAA fails to create the close relationship necessary *613 to remove its activities from the extensive regulation associated with private foundation status. We therefore do not have to determine whether petitioner meets section 509(a)(3)(A) or (C). Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the year in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioner has satisfied the prerequisites for this declaratory judgment. See section 7428(b)(1)-(3). See also Rule 210(c).
3. SEC. 509. PRIVATE FOUNDATION DEFINED. (a) GENERAL RULE. -- For purposes of this title, the term "private foundation" means a domestic or foreign organization described in section 501(c)(3) other than -- (1) an organization described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)); (2) an organization which -- (A) normally receives more than one-third of its support in each taxable year from any combination of -- (i) gifts, grants, contributions, or membership fees, and (ii) gross receipts from admissions, sales of merchandise, performance of services, or furnishing of facilities, in an activity which is not an unrelated trade or business (within the meaning of section 513), not including such receipts from any person, or from any bureau or similar agency of a governmental unit (as described in section 170(c)(1)), in any taxable year to the extent such receipts exceed the greater of $5,000 or 1 percent of the organization's support in such taxable year, from persons other than disqualified persons (as defined in section 4946) with respect to the organization, from governmental units described in section 170(c)(1), or from organizations described in section 170(b)(1)(A) (other than in clauses (vii) and (viii)), and (B) normally receives not more than one-third of its support in each taxable year from the sum of -- (i) gross investment income (as defined in subsection (e)) and (ii) the excess (if any) of the amount of the unrelated business taxable income (as defined in section 512) over the amount of the tax imposed by section 511; (3) an organization which -- (A) is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more specified organizations described in paragraph (1) or (2), (B) is operated, supervised, or controlled by or in connection with one or more organizations described in paragraph (1) or (2), and (C) is not controlled directly or indirectly by one or more disqualified persons (as defined in section 4946) other than foundation managers and other than one or more organization described in paragraph (1) or (2) * * *.↩
4. Section 1.509(a)-4(f)(4), Income Tax Regs., gives a general description of the three types of relationships described in section 1.509(a)-4(f)(2), Income Tax Regs. These relationships are specifically described in section 1.509(a)-4(g), (h), and (i), Income Tax Regs.↩
5. Section 1.509(a)-4(h)(1), Income Tax Regs., provides -- (h) Meaning of "supervised or controlled in connection with". (1) In order for a supporting organization to be "supervised or controlled in connection with" one or more publicly supported organizations, there must be common supervision or control by the persons supervising or controlling both the supporting organization and the publicly supported organizations to insure that the supporting organization will be responsive to the needs and requirements of the publicly supported organizations. Therefore, in order to meet such requirement, the control or management of the supporting organization must be vested in the same persons that control or manage the publicly supported organizations.